## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

CHERYL BEANS, individually and as
ADMINISTRATRIX
of the ESTATE OF SHANE ALLEN RYAN,
deceased, Stark County, Ohio Probate Case
No. 223549
9348 Briggle SW
East Sparta, Ohio 44626

CASE NO. _____

Plaintiffs,

JUDGE: _____

vs.

**CIVIL COMPLAINT (FOR
WRONGFUL DEATH; 42 U.S.C. §1983;
STATE CLAIMS)**
*(PLAINTIFFS INCORPORATE BY REFERENCE
THE EXHIBITS SUBMITTED HEREWITH WITH THE
SAME FORCE AND EFFECT AS IF HEREIN
SEPARATELY SET FORTH)*

CITY OF MASSILLON
c/o Pericles G. Stergios, Law Director
2 James Duncan Plaza SE
Massillon, Ohio 44646-6653

**Defendant #1**

**JURY DEMAND ENDORSED
HEREON**

and

KATHY CATAZARO-PERRY, Mayor
*(in her individual and official capacity)*
c/o Pericles G. Stergios, Law Director
2 James Duncan Plaza SE
Massillon, Ohio 44646-6653

**Defendant #2**

and

WILLIAM C. PEEL
*(in his individual and official capacity)*
Interim Chief of Police
Massillon Police Department
c/o Pericles G. Stergios, Law Director
2 James Duncan Plaza SE
Massillon, Ohio 44646-6653

**Defendant #3**

and

PAUL COVERT
*(in his individual and official capacity)*
Captain
Massillon Police Department
c/o Pericles G. Stergios, Law Director
2 James Duncan Plaza SE
Massillon, Ohio 44646-6653

**Defendant #4**

and

JASON GREENFIELD
*(in his individual and official capacity)*
Lieutenant
Massillon Police Department
c/o Pericles G. Stergios, Law Director
2 James Duncan Plaza SE
Massillon, Ohio 44646-6653

**Defendant #5**

and

DAVID MCCONNELL
*(in his individual and official capacity)*
Police Officer
Massillon Police Department
c/o Pericles G. Stergios, Law Director
2 James Duncan Plaza SE
Massillon, Ohio 44646-6653

**Defendant #6**

and

CITY OF CANTON
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #7**

and

William J. Healy II
*(in his individual and official capacity)*
Mayor, City of Canton
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #8**

and

BRUCE LAWVER
*(in his individual and official capacity)*
Chief of Police
Canton Police Department
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #9**

and

LISA M. BROUCKER
*(in her individual and official capacity)*
Police Officer
Canton Police Department
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #10**

and

CHARLES S. SALER
*(in his individual and official capacity)*
Sergeant
Canton Police Department
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #11**

and

TRAVIS M. PELLEGRINO
*(in his individual and official capacity)*
Police Officer
Canton Police Department
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #12**

and

DONALD E. MILLER, JR.
*(in his individual and official capacity)*
Police Officer
Canton Police Department
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #13**

and

BRANDON SHACKLE
*(in his individual and official capacity)*
Police Officer
Canton Police Department
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #14**

DAVID DAVIS
*(in his individual and official capacity)*
Captain
Canton Police Department
c/o Joseph Martuccio, Law Director
City of Canton-Law Department
Canton City Hall
218 Cleveland Ave SW 7th Floor
Canton, OH   44702-1423

**Defendant #15**

Defendants.

## INTRODUCTORY SUMMARY

1. This matter involves an unarmed emotionally disturbed 25 year old man that police cornered inside a "closet sized" room in a hair salon for an hour and a half; and when he asked if he could smoke, the police gave him a cigarette lighter and then killed him for having the lighter.

2. Shane Ryan ("DECEDENT") walked from downtown Canton to the south side of Massillon in an attempt to reconcile with his girlfriend.

3. DECEDENT's girlfriend worked at the Great Clips hair salon near the Wal-Mart store on S.R. 21 just south of Massillon.

4. DECEDENT had a history of struggles with emotional/mental problems and the Massillon Police Department ("MPD") had arrested DECEDENT just a month earlier for threatening suicide.

5. During his walk, DECEDENT called the Canton Crisis Intervention and Recovery Center ("Crisis Center") several times and alerted them that he was suffering from another emotionally destabilizing event.

6. The Crisis Center notified the Stark County Sheriff's Office who in turn notified the MPD of DECEDENT's struggles and that DECEDENT may be suicidal.

7. DECEDENT arrived at the Great Clips salon, was disappointed at finding that his girlfriend was not there and created a disturbance.

8. The disturbance resulted in MPD being sent to the scene.

9. DECEDENT saw MPD pull up to the store, so DECEDENT retreated to a small interior room accompanied by an employee who was trying to call DECEDENT's girlfriend for DECEDENT.

10. The MPD considered the situation an "active hostage" situation and called for backup.

11. The MPD encircled the building and confined DECEDENT to that small 7'X10' utility/breakroom.

12. The stand-off continued for the next hour and a half.

13. During that time, MPD called Canton Police Department ("CPD") and requested the CPD's SPECIAL WEAPONS AND TACTICS ("SWAT") team to come to Massillon because of DECEDENT's situation.  (Exhibit A at Appx. 007)

14. During this time DECEDENT asked for cigarettes and a lighter.

15. MPD officers stated they would comply and make a trade with DECEDENT for any weapons he possessed.

16. MPD officers at this time knew that DECEDENT was mentally unstable and had access to a natural gas water heater located in DECEDENT's room.

17. Still, MPD made the trade with DECEDENT and gave him the lighter while still supplying DECEDENT's room with natural gas. (Exhibit "A" Appx. 008.)

18. After the trade, MPD officers called DECEDENT's cellular phone and asked him if they could talk to the Great Clips' employee that was in the room with him.

19. DECEDENT agreed and gave his phone to the employee.

20. During that conversation, MPD officers learned that DECEDENT did NOT have any more weapons, that he was unarmed and could easily be apprehended.

21. MPD officers knew from other salon employees that the door to DECEDENT's room did not have a lock, still MPD supervisors restrained their officers and awaited SWAT.

22. SWAT arrived and MPD officers informed them that DECEDENT was threatening to blow the building up by igniting the natural gas being supplied to the water heater in DECEDENT's room.

23. Still, MPD and CPD officers continued supplying the room with natural gas – even though the shut-off for the building was easily accessible at the building's back door. (Exhibit "A" Appx. 002-004.)

24. SWAT then entered the Great Clips building.

25. The SWAT team members did not talk to DECEDENT, instead within one minute of entering the building the SWAT team stormed into DECEDENT's room and shot DECEDENT through the heart and head killing him.

**JURISDICITON AND VENUE**

1. This action being filed pursuant to 42 U.S.C. 1983 and 1988 to address injuries suffered by DECEDENT for deprivation under color of state law of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §1331.  This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. §1367.

2. Plaintiffs further invoke the pendent jurisdiction of the Court to consider claims arising under State law, including O.R.C. §§2125.01, 2125.02 and 2305.231, otherwise known as the wrongful death and survivor statutes.

3. Venue in the United States District Court, Southern District of Ohio, Eastern Division, is proper pursuant to 28 U.S.C. §1391.

**PARTIES**

**PLAINTIFF CHERYL BEANS**

1. Plaintiff, CHERYL BEANS is the Adiminstratrix of the estate of SHANE ALLEN RYAN who is deceased (hereinafter referred to as "the DECEDENT").  BEANS is the mother of DECEDENT and brings this action individually and for the benefit of the next of kin and heirs of SHANE ALLEN RYAN.

2. Plaintiff, CHERYL BEANS, at all times relevant hereto, is and adult citizen of the State of Ohio, and the United States of America, and at all times resided in the State of Ohio, and is the mother, heir and wrongful death beneficiary of the Decedent SHANE ALLEN RYAN

(hereinafter "DECEDENT").  She sues in her own capacity and as a Representative of Decedent and/or his estate.

## DEFENDANTS

## CITY OF MASSILLON

### Defendant #1

3. Defendant #1, City of Massillon, Ohio (hereinafter "City of Massillon" or "Defendant #1") is a unit of local government organized under the laws of the State of Ohio.  The City of Massillon is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law.

4. The Defendant #1 denied DECEDENT his constitutional rights without due process of law and the deprivations of DECEDENT'S rights was proximately caused and permitted by certain customs or policies of the City of Massillon, including but not limited to the failure to adequately hire, train, supervise, investigate and discipline law enforcement officers, unlawful abdication of authority, and the ratification of violations of DECEDENT's constitutional rights.

## MAYOR KATHY CATAZARO-PERRY

### Defendant #2

5. Defendant #2, Mayor Kathy Catazaro-Perry (hereinafter referred to as "MAYOR CATAZARO-PERRY" or "Defendant #2") is and was at all times relevant to this action the mayor and chief executive officer for the City of Massillon, Ohio who had direct supervisory command and control over the MASSILLON POLICE DEPARTMENT, and was a primary policy maker for the City of Massillon.

6. Defendant #2 is a "person under 42 U.S.C. §1983.

7. MAYOR CATAZARO-PERRY at all times relevant to this case acted under color of state law.

8. Defendant #2 is sued in both her individual and official capacities.

9. As Mayor of the City of Massillon, Defendant #2 formulated the city's customs, practice and policies concerning how it used its police officers.  Thus, the City of Massillon's unlawful "abdication of authority" of its police powers granted by the State of Ohio to the City of Massillon was proximately caused by certain customs, practices and policies existing in the City of Massillon that were formulated by Defendant #2.  The City of Massillon's unlawful abdication of the State's police powers were proximately caused by certain customs, practices and policies existing in the City of Massillon and formulated by Defendant #2. These customs, practices and policies include, but are not limited to, failure to adequately and properly train MASSILLON POLICE DEPARTMENT ("hereinafter referred to as "the MPD") personnel regarding the constitutional rights of citizens and in particular the Due Process guarantee to be free from unreasonable seizures by persons unauthorized by law.

10. Defendant #2's violated Ohio Revised Code 737.11 when she failed to preserve the peace and protect Decedent by disobeying Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII by unlawfully allowing the MPD to unlawfully abdicate it police authority to enable extra-jurisdictional persons to unreasonably seize Decedent by shooting a bullet through his brain without lawful authority in violation of the Due Process clause of the Fourteenth Amendment.

11. Defendant #2 violated her duty to abide by the laws of the State of Ohio, violated her duty to supervise her police officers by failing to establish lawful customs, practices and policies for the MPD which resulted in Decedent being shot and killed by deliberate, wanton, reckless

and negligent acts by persons Defendant #2 was not authorized by law to clothe as an independent contractor with the police powers of the State of Ohio.

12. In this case, Defendant #2 acquiesced in, ratified, encouraged and/or approved the unconstitutional "abdication of authority" to extra-jurisdictional independent contractors who deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law when extra-jurisdictional independent contractors were empowered by Defendant #2's customs, practices and policies toward the unlawful "abdication of authority".

## CHIEF WILLIAM C. PEEL
### Defendant #3

13. Defendant #3 WILLIAM C. PEEL ("hereinafter "PEEL" or "Defendant #3") did at all times relevant to this action hold the office of Chief of Police for the MPD and was employed by the City of Massillon, Ohio as the chief executive officer for the MPD who had direct supervisory command and control over the members of the MPD, and was a primary policy maker for the MPD.

14. Defendant #3 is a "person under 42 U.S.C. §1983.

15. PEEL at all times relevant to this case acted under color of state law.

16. Defendant #3 is sued in both his individual and official capacities.

17. Defendant #3 – as the chief of police – had final policy-making authority as to the exercise of the State's police power within the boundaries of the City of Massillon and the MPD's contact with persons within the city's boundaries.  The MPD's unlawful abdication of the police powers granted by the State of Ohio to unauthorized persons was proximately caused

by certain customs, practices and policies existing within the MPD.  These customs, practices and policies include, but are not limited to, failure to adequately and properly train members of the MPD regarding the constitutional rights of citizens and in particular the Due Process guarantee to be free from unreasonable seizures by persons unauthorized by law.

18. Defendant #3 failed to preserve the peace and failed to protect Decedent from an unlawful excessive use of force by maintaining customs, practices and policies that enabled members of the MPD to disobey the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII;  by empowering members of the MPD to unlawfully abdicate the state's police authority to unauthorized persons which led to the unlawful and unreasonable seizure of Decedent by having a bullet shot through his brain without lawful authority in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution.

19. Defendant #3 violated his duty to abide by the laws of the State of Ohio, violated his duty to supervise his police officers by failing to establish lawful customs, practices and policies for the MPD which resulted in Decedent being shot and killed by deliberate, wanton, reckless and negligent acts by independent contractors Defendant #3 was not authorized by law to clothe with the police powers of the State of Ohio.

20. In this case, Defendant #3 acquiesced in, ratified, encouraged and/or approved the unconstitutional "abdication of authority" to extra-jurisdictional independent contractors who deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law when extra-

jurisdictional independent contractors were empowered by Defendant #3's customs, practices and policies toward the unlawful "abdication of authority".

## CAPTAIN PAUL COVERT

### Defendant #4

21. Defendant #4, PAUL COVERT ("hereinafter "COVERT" or "Defendant #4") did at all times relevant to this action hold the office of Captain of Police for the MPD and was employed by the City of Massillon, Ohio as an executive officer for the MPD who had direct supervisory command and control over the members of the MPD.

22. Defendant #4 is a "person under 42 U.S.C. §1983.

23. COVERT at all times relevant to this case acted under color of state law.

24. Defendant #4 is sued in both his individual and official capacities.

25. Defendant #4 was at the scene of Decedent's killing when Decedent was killed and had authority to the exercise of the State's police power within the boundaries of the City of Massillon to arrest Decedent.  Defendant #4 directed, allowed and or acquiesced in the MPD's unlawful abdication of the police powers granted by the State of Ohio to unauthorized extra-jurisdictional independent contractors and this abdication of authority proximately caused Decedent to be deprived of his life and liberty in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution because said deprivations were unreasonable seizures unauthorized by law.

26. Defendant #3 failed to preserve the peace and failed to protect Decedent from an unlawful excessive use of force by maintaining customs, practices and policies that enabled members of the MPD to disobey the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII;  by empowering members of the MPD to unlawfully

abdicate the state's police authority to unauthorized persons which led to the unlawful and unreasonable seizure of Decedent by having a bullet shot through his brain without lawful authority in violation of the Due Process clause of the Fourteenth Amendment.

27. Defendant #4 violated his duty to abide by the laws of the State of Ohio, violated his duty to supervise his police officers by failing to prevent the unlawful abdication of authority which resulted in Decedent being shot and killed by deliberate, wanton, reckless and negligent acts perpetrated by independent contractors who Defendant #4 was not authorized by law to clothe with the police powers of the State of Ohio.

28. In this case, Defendant #4 directed, allowed, acquiesced, ratified, encouraged and/or approved the unconstitutional "abdication of authority" to extra-jurisdictional independent contractors who deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.

## LIEUTENANT JASON GREENFIELD

### Defendant #5

29. Defendant #5, JASON GREENFIELD ("hereinafter "GREENFIELD" or "Defendant #5") did at all times relevant to this action hold the office of  Lieutenant of Police for the MPD and was employed by the City of Massillon, Ohio as an commands and supervising officer for the MPD, and who had direct supervisory command and control over the members of the MPD at the scene of Decedent's killing.

30. Defendant #5 is a "person under 42 U.S.C. §1983.

31. GREENFIELD at all times relevant to this case acted under color of state law.

32. Defendant #5 is sued in both his individual and official capacities.

33. Defendant #5 was at the scene of when Decedent was killed by shots through his heart and brain and had authority to the exercise of the State's police power within the boundaries of the City of Massillon to arrest Decedent.  Defendant #5 directed, allowed and or acquiesced in the MPD's unlawful abdication of the police powers granted by the State of Ohio to unauthorized extra-jurisdictional independent contractors and this abdication of authority proximately caused Decedent to be deprived of his life and liberty in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution because said deprivations were unreasonable seizures unauthorized by law.

34. Defendant #5 failed to preserve the peace and failed to protect Decedent from an unlawful excessive use of force by directing, allowing and acquiescing in the use of extra-jurisdictional independent contractors to disobey the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII;  which was an unlawful abdication the state's police authority to unauthorized independent contractors which directly and proximately caused the unlawful and unreasonable seizure of Decedent by having a bullet shot through his heart and his brain without lawful authority in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution.

35. Defendant #5 violated his duty to abide by the laws of the State of Ohio, by failing to supervise his police officers and not preventing the unlawful abdication of authority which resulted in Decedent being shot and killed by deliberate, wanton, reckless and negligent acts perpetrated by independent contractors who Defendant #5 was not authorized by law to clothe with the police powers of the State of Ohio.

36. In this case, Defendant #5 directed, allowed, acquiesced, ratified, encouraged and/or approved the unconstitutional "abdication of authority" to extra-jurisdictional independent contractors who deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.

37. In this case, Defendant #5 increased the harm DECEDENT encountered when he gave DECEDENT – who was emotionally unstable at the time – a cigarette lighter while simultaneously providing him with access to a steady stream of natural gas and then sent in Canton SWAT who killed DECEDENT for having the cigarette lighter.

## PATROLMAN DAVID MCCONNELL

### Defendant #6

38. Defendant #6, DAVID MCCONNELL ("hereinafter "MCCONNELL" or "Defendant #6") did at all times relevant to this action hold the office of  Patrolman for the MPD and was employed by the City of Massillon, Ohio as a police officer for the MPD, and who was present at and participated in the events that directly and proximately caused Decedent to be unlawfully seized by being killed with shots to the heart and brain.

39. Defendant #6 is a "person under 42 U.S.C. §1983.

40. MCCONNELL at all times relevant to this case acted under color of state law.

41. Defendant #6 is sued in both his individual and official capacities.

42. Defendant #6 was at the scene of when Decedent was killed by shots through his heart and brain and had authority to the exercise of the State's police power within the boundaries of the City of Massillon to arrest Decedent.  Defendant #6 cornered Decedent within a small "closet sized" room and gave Decedent a cigarette lighter.  Defendant #6 then aided extra-

jurisdictional independent contractors in assaulting and killing Decedent – for possessing the lighter Defendant #6 gave Decedent.

43. Defendant #6 failed to preserve the peace and failed to protect Decedent from an unlawful and excessive use of force by directing, allowing and acquiescing in the use of extra-jurisdictional independent contractors to disobey the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII – that was an unlawful abdication the state's police authority to unauthorized independent contractors – which directly and proximately caused the unlawful and unreasonable seizure of Decedent by having a bullet shot through his heart and his brain without lawful authority in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution.

44. Defendant #6 violated his duty to abide by the laws of the State of Ohio, by participating in the unlawful abdication of authority which resulted in Decedent being shot and killed by the deliberate, wanton, reckless and negligent acts perpetrated by independent contractors who could not be authorized by law to exercise the police powers of the State of Ohio.

45. In this case, Defendant #6 participated, acquiesced, ratified, and/or encouraged the unconstitutional "abdication of authority" to extra-jurisdictional independent contractors who deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.

46. In this case, Defendant #5 increased the harm DECEDENT encountered when he gave DECEDENT – who was emotionally unstable at the time – a cigarette lighter while

simultaneously providing him with access to a steady stream of natural gas and then sent in

Canton SWAT who killed DECEDENT for having the cigarette lighter.

## CITY OF CANTON

### Defendant #7

47. Defendant #7, CITY OF CANTON, Ohio (hereinafter "CITY OF CANTON" or "Defendant

#7") is a unit of local government organized under the laws of the State of Ohio.  The City of

Canton is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under

color of law.

48. The Defendant #7 denied DECEDENT his constitutional rights without due process of law

and the deprivations of DECEDENT'S rights were directly/proximately caused and permitted

by certain customs or policies of the City of Canton, including but not limited to the failure to

adequately train, supervise, investigate and discipline law enforcement officers, unlawful

usurpation of authority, and the ratification of violations of DECEDENT's constitutional

rights.

## MAYOR WILLIAM J. HEALY, II.

### Defendant #8

49. Defendant #8, MAYOR WILLIAM J. HEALY, II. (hereinafter referred to as "MAYOR

HEALY" or "Defendant #8") is and was at all times relevant to this action the mayor and

chief executive officer for the City of Canton, Ohio who had direct supervisory command

and control over the CANTON POLICE DEPARTMENT, and was a primary policy maker

for the City of Canton.

50. Defendant #8 is a "person under 42 U.S.C. §1983.

51. MAYOR HEALY at all times relevant to this case acted under color of state law.

52. Defendant #8 is sued in both his individual and official capacities.

53. As Mayor of the City of Canton, Defendant #8 formulated the city's customs, practice and policies concerning how it used its police officers.  Thus, the City of Canton's unlawful usurpation of the police powers granted by the State of Ohio to the City of Massillon was proximately caused by certain customs, practices and policies existing in the City of Canton that were formulated by Defendant #8.  These customs, practices and policies include, but are not limited to, failure to adequately and properly train CANTON POLICE DEPARTMENT ("hereinafter referred to as "the CPD") personnel regarding the constitutional rights of citizens and in particular the Due Process guarantee to be free from unreasonable seizures by persons unauthorized by law.

54. Defendant #8 violated Ohio Revised Code 737.11 when he failed to preserve the peace and protect Decedent from his police officers' unlawful usurpation of police powers thereby disobeying Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII by unlawfully allowing the CPD to unlawfully usurp police authority to enable CPD officers extra-jurisdictional actions as independent contractors to unreasonably seize Decedent by shooting a bullet through his heart and his brain without lawful authority in violation of the Due Process clause of the Fourteenth Amendment.

55. Defendant #8 violated his duty to abide by the laws of the State of Ohio, violated his duty to supervise his police officers by failing to establish lawful customs, practices and policies for the CPD which resulted in Decedent being shot and killed by deliberate, wanton, reckless and negligent acts by persons Defendant #8 was not authorized by law to clothe with extra-jurisdictional police powers of the State of Ohio that was not granted to the City of Canton.

56. In this case, Defendant #8 acquiesced in, ratified, encouraged and/or approved CPD's officers' unconstitutional "usurpation of authority" and to act as extra-jurisdictional independent contractors who then deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law;  because Defendant #8's  established customs, practices and policies empowered CPD officers to act extra-jurisdictionally as independent contractors.

## CHIEF BRUCE LAWVER

### Defendant #9

57. Defendant #9 CHIEF BRUCE LAWVER ("hereinafter "LAWVER" or "Defendant #9") did at all times relevant to this action hold the office of Chief of Police for the CPD and was employed by the City of Canton, Ohio as the chief executive officer for the CPD who had direct supervisory command and control over the members of the CPD, and was a primary policy maker for the CPD.

58. Defendant #9 is a "person under 42 U.S.C. §1983.

59. LAWVER at all times relevant to this case acted under color of state law.

60. Defendant #9 is sued in both his individual and official capacities.

61. Defendant #9 – as the chief of police – formulated the city's customs, practices and policies of unlawful usurpation of the State's police powers that were granted to other municipalities. These customs, practices and policies include, but are not limited to, failure to adequately and properly train CANTON POLICE DEPARTMENT ("hereinafter referred to as "the CPD") personnel regarding the constitutional rights of citizens and in particular the Due

Process guarantee to be free from unlawful/unreasonable seizures by persons unauthorized by law.

62. Defendant #9 failed to preserve the peace and failed to protect Decedent from an unlawful excessive use of force by maintaining customs, practices and policies that enabled members of the CPD to disobey the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII;  by empowering members of the CPD to unlawfully usurp the State's police powers led to the unlawful and unreasonable seizure of Decedent by having a bullet shot through his brain without lawful authority in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution.

63. Defendant #9 violated his duty to abide by the laws of the State of Ohio, violated his duty to supervise his police officers by failing to establish lawful customs, practices and policies for the CPD which resulted in Decedent being shot and killed by deliberate, wanton, reckless and negligent acts by CPD members as independent contractors. Defendant #9 was not authorized by law to clothe CPD officers with police powers the State of Ohio delegated to other municipalities.

64. In this case, Defendant #9 acquiesced in, ratified, encouraged and/or approved the unconstitutional "usurpation of authority" to use CPD officers as extra-jurisdictional independent contractors who deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.  Thus, DECEDENT was directly and proximately harmed by Defendant #3's customs, practices and policies permitting the CPD officers unlawfully "usurp authority" from another municipality.

## OFFICER LISA M. BROUCKER

### Defendant #10

65. Defendant #10, LISA M. BROUCKER ("hereinafter "BROUCKER" or "Defendant #10")
   did at all times relevant to this action act a shift supervisor on the CPD and was employed by
   the City of Canton, Ohio as a command and supervising officer for the CPD, and who had
   direct supervisory command and control over the members of the CPD on duty at all times
   relevant to this action and permitted her subordinates to travel to Massillon where they
   assaulted and shot and killed Decedent.

66. Defendant #10 is a "person under 42 U.S.C. §1983.

67. BROUCKER at all times relevant to this case acted under color of state law.

68. Defendant #10 is sued in both her individual and official capacities.

69. Defendant #10 was a shift supervisor on-duty in the City of Canton when she received a call
   from GREENFIELD requesting certain Canton officers to assist MPD.  Defendant #10
   directed, allowed and or acquiesced in the CPD's unlawful usurpation of State police powers
   granted to the City of Massillon when she permitted her subordinates to travel to the City of
   Massillon and operate as extra-jurisdictional independent contractors in violation of Ohio
   Constitution § 3 of Article XVIII and Section 2935.03 of the Ohio Revised Code.  Said
   usurpation of State Police Power proximately caused Decedent to be deprived of his life and
   liberty in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments
   to the United States Constitution because said deprivations were unreasonable seizures
   unauthorized by law.

70. Defendant #10 failed to preserve the peace and failed to protect Decedent from an unlawful
   excessive use of force by directing, allowing and acquiescing in the use of her subordinates

as extra-jurisdictional independent contractors to disobey the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII;  which was an unlawful usurpation of the state's police which directly and proximately caused the unlawful and unreasonable seizure of Decedent by having a bullet shot through his heart and his brain without lawful authority in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution.

71. Defendant #10 violated her duty to abide by the laws of the State of Ohio, by failing to supervise her subordinate police officers and not preventing the unlawful usurpation of authority which resulted in Decedent being shot and killed by deliberate, wanton, reckless and negligent acts perpetrated by CPD officers acting as independent contractors.

72. In this case, Defendant #10 directed, allowed, acquiesced, ratified, encouraged and/or approved the unconstitutional "usurpation of authority" to use CPD officers as extra-jurisdictional independent contractors who deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.

**SGT. CHARLES S. SALER**

**Defendant #11**

73. Defendant #11, CHARLES S. SALER ("hereinafter "SALER" or "Defendant #11") did at all times relevant to this action hold the office of Sergeant for the CPD and was employed by the City of Canton, Ohio as a police officer for the CPD, and who was present at and participated in the events that directly and proximately caused Decedent to be unlawfully seized by being killed with shots to the heart and brain.

74. Defendant #11 is a "person under 42 U.S.C. §1983.

75. SALER at all times relevant to this case acted under color of state law.

76. Defendant #11 is sued in both his individual and official capacities.

77. Defendant #11 was at the scene in Massillon, Ohio and shot Decedent in his heart and his brain but did NOT have lawful authority to the exercise of the State's police power within the boundaries of the City of Massillon.  Defendant #11 stormed the small "closet sized" room that MPD had Decedent cornered in and immediately shot and killed Decedent.

78. Defendant #11 failed to preserve the peace and failed to protect Decedent from an unlawful and excessive use of force by his direct actions as an extra-jurisdictional independent contractor in contravention to the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII.  Defendant #11's extra-jurisdictional acts as an independent contractor were an unlawful usurpation the state's police power that had been delegated to the City of Massillon and proximately caused the unlawful and unreasonable seizure of Decedent without lawful authority in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution.

79. Defendant #11 violated his duty to abide by the laws of the State of Ohio, by participating in the unlawful usurpation of authority which resulted in Decedent being shot and killed by the deliberate, wanton, reckless and negligent acts perpetrated while acting as an independent contractors who could not be authorized by law to exercise the police powers of the State of Ohio within the City of Massillon.

80. In this case, Defendant #11 participated, acquiesced, ratified, and/or encouraged the unconstitutional "usurpation of authority" to act as extra-jurisdictional independent contractors and deliberately, willfully, wantonly, recklessly and negligently used excessive

force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.

## OFFICER TRAVIS M. PELLEGRINO

### Defendant #12

81. Defendant #12, TRAVIS M. PELLEGRINO ("hereinafter "PELLEGRINO" or "Defendant #12") did at all times relevant to this action hold the position of a police officer and was employed by the City of Canton, Ohio as a police officer for the CPD, and who was present at and participated in the events that directly and proximately caused Decedent to be unlawfully seized by being killed with shots to the heart and brain.

82. Defendant #12 is a "person under 42 U.S.C. §1983.

83. PELLEGRINO at all times relevant to this case acted under color of state law.

84. Defendant #12 is sued in both his individual and official capacities.

85. Defendant #12 was at the scene in Massillon, Ohio and assaulted and assisted with shooting Decedent in his heart and his brain but did NOT have lawful authority to exercise the State's police power within the boundaries of the City of Massillon.  Defendant #12 stormed the small "closet sized" room that MPD had Decedent cornered in and assisted SALER in shooting and killing Decedent.

86. Defendant #12 failed to preserve the peace and failed to protect Decedent from an unlawful and excessive use of force by his direct actions as an extra-jurisdictional independent contractor in contravention to the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII.  Defendant #12's extra-jurisdictional acts as an independent contractor were an unlawful usurpation the state's police power that had been delegated to the City of Massillon and proximately caused the unlawful and unreasonable

seizure of Decedent without lawful authority in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution.

87. Defendant #12 violated his duty to abide by the laws of the State of Ohio, by participating in the unlawful usurpation of authority which resulted in Decedent being shot and killed by the deliberate, wanton, reckless and negligent acts perpetrated while acting as an independent contractors who could not be authorized by law to exercise the police powers of the State of Ohio within the City of Massillon.

88. In this case, Defendant #12 participated, acquiesced, ratified, and/or encouraged the unconstitutional "usurpation of authority" to act as extra-jurisdictional independent contractors and deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.

### OFFICER DONALD E. MILLER, JR.

### Defendant #13

89. Defendant #13, DONALD E. MILLER, JR. ("hereinafter "MILLER" or "Defendant #13") did at all times relevant to this action hold the position of a police officer and was employed by the City of Canton, Ohio as a police officer for the CPD, and who was present at and participated in the events that directly and proximately caused Decedent to be unlawfully seized by being killed with shots to the heart and brain.

90. Defendant #13 is a "person under 42 U.S.C. §1983.

91. MILLER at all times relevant to this case acted under color of state law.

92. Defendant #13 is sued in both his individual and official capacities.

93. Defendant #13 was at the scene in Massillon, Ohio and assaulted and assisted with shooting Decedent in his heart and his brain but did NOT have lawful authority to exercise the State's police power within the boundaries of the City of Massillon.  Defendant #13 stormed the small "closet sized" room that MPD had Decedent cornered in and assisted SALER in shooting and killing Decedent.

94. Defendant #13 failed to preserve the peace and failed to protect Decedent from an unlawful and excessive use of force by his direct actions as an extra-jurisdictional independent contractor in contravention to the jurisdictional constraints of Ohio Revised Code 2935.03 and Ohio Constitution § 3 of Article XVIII.  Defendant #13's extra-jurisdictional acts as an independent contractor were an unlawful usurpation the state's police power that had been delegated to the City of Massillon and proximately caused the unlawful and unreasonable seizure of Decedent without lawful authority in violation of the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States Constitution.

95. Defendant #13 violated his duty to abide by the laws of the State of Ohio, by participating in the unlawful usurpation of authority which resulted in Decedent being shot and killed by the deliberate, wanton, reckless and negligent acts perpetrated while acting as an independent contractors who could not be authorized by law to exercise the police powers of the State of Ohio within the City of Massillon.

96. In this case, Defendant #13 participated, acquiesced, ratified, and/or encouraged the unconstitutional "usurpation of authority" to act as extra-jurisdictional independent contractors and deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.

## OFFICER BRANDON SHACKLE

### Defendant #14

97.  Defendant #14, BRANDON SHACKLE ("hereinafter "SHACKLE" or "Defendant #14")

did at all times relevant to this action hold the position of a police officer and was employed

by the City of Canton, Ohio as a police officer for the CPD, and who was present at and

participated in the events that directly and proximately caused Decedent to be unlawfully

seized by being killed with shots to the heart and brain.

98. Defendant #14 is a "person under 42 U.S.C. §1983.

99. SHACKLE at all times relevant to this case acted under color of state law.

100.    Defendant #14 is sued in both his individual and official capacities.

101.    Defendant #14 was at the scene in Massillon, Ohio and assaulted and assisted with

shooting Decedent in his heart and his brain but did NOT have lawful authority to exercise

the State's police power within the boundaries of the City of Massillon.  Defendant #14

stormed the small "closet sized" room that MPD had Decedent cornered in and assisted

SALER in shooting and killing Decedent.

102.    Defendant #14 failed to preserve the peace and failed to protect Decedent from an

unlawful and excessive use of force by his direct actions as an extra-jurisdictional

independent contractor in contravention to the jurisdictional constraints of Ohio Revised

Code 2935.03 and Ohio Constitution § 3 of Article XVIII.  Defendant #14's extra-

jurisdictional acts as an independent contractor were an unlawful usurpation the state's police

power that had been delegated to the City of Massillon and proximately caused the unlawful

and unreasonable seizure of Decedent without lawful authority in violation of the Due

Process guarantees of the Fourth and Fourteenth Amendments to the United States

Constitution.

103.   Defendant #14 violated his duty to abide by the laws of the State of Ohio, by participating in the unlawful usurpation of authority which resulted in Decedent being shot and killed by the deliberate, wanton, reckless and negligent acts perpetrated while acting as an independent contractors who could not be authorized by law to exercise the police powers of the State of Ohio within the City of Massillon.

104.   In this case, Defendant #14 participated, acquiesced, ratified, and/or encouraged the unconstitutional "usurpation of authority" to act as extra-jurisdictional independent contractors and deliberately, willfully, wantonly, recklessly and negligently used excessive force upon Decedent by killing Decedent with shots to the heart and brain so as to deprive DECEDENT of his constitutional rights of life and liberty without due process of law.

## CAPTAIN DAVID DAVIS

## Defendant #15

105.   Defendant #15, DAVID DAVIS ("hereinafter "DAVIS" or "Defendant #15") did at all times relevant to this action hold the office of Captain of Police for the CPD and was employed by the City of Canton, Ohio as an executive officer for the CPD who had direct supervisory command and control over the members of the CPD.

106.   Defendant #15 is a "person under 42 U.S.C. §1983.

107.   DAVIS at all times relevant to this case acted under color of state law.

108.   Defendant #15 is sued in both his individual and official capacities.

109.   Defendant #15 – as the Captain in charge of the Canton SWAT Cooperative Team  – formulated the city's customs, practices and policies concerning the use of Canton SWAT to unlawfully usurp the State's police powers that were granted to other municipalities. These customs, practices and policies include, but are not limited to, failure to adequately and

properly train CANTON POLICE DEPARTMENT ("hereinafter referred to as "the CPD")

personnel regarding the constitutional rights of citizens and in particular the Due Process

guarantee to be free from unlawful/unreasonable seizures by persons unauthorized by law.

110.     Defendant #15 failed to preserve the peace and failed to protect Decedent from an

unlawful excessive use of force by maintaining customs, practices and policies that enabled

members of the CPD to disobey the jurisdictional constraints of Ohio Revised Code 2935.03

and Ohio Constitution § 3 of Article XVIII;  by empowering members of the CPD to

unlawfully usurp the State's police powers led to the unlawful and unreasonable seizure of

Decedent by having a bullet shot through his brain without lawful authority in violation of

the Due Process guarantees of the Fourth and Fourteenth Amendments to the United States

Constitution.

111.     Defendant #15 violated his duty to abide by the laws of the State of Ohio, violated his

duty to supervise his police officers by failing to establish lawful customs, practices and

policies for the CPD which resulted in Decedent being shot and killed by deliberate, wanton,

reckless and negligent acts by CPD members as independent contractors. Defendant #9 was

not authorized by law to clothe CPD officers with police powers the State of Ohio delegated

to other municipalities.

112.     In this case, Defendant #15 acquiesced in, ratified, encouraged and/or approved the

unconstitutional "usurpation of authority" to use CPD officers as extra-jurisdictional

independent contractors who deliberately, willfully, wantonly, recklessly and negligently

used excessive force upon Decedent by killing Decedent with shots to the heart and brain so

as to deprive DECEDENT of his constitutional rights of life and liberty without due process

of law.  Thus, DECEDENT was directly and proximately harmed by Defendant #15's

customs, practices and policies permitting the CPD officers unlawfully "usurp authority" from another municipality.

## STATEMENT OF FACTS

### FACTUAL BASIS OF CLAIMS FOR RELIEF APPLICABLE TO ALL CLAIMS

113.   The incident leading to this action began on Sunday, July 28, 2013.  DECEDENT had slept at his dad's house in downtown Canton after arguing with his girlfriend.  DECEDENT awoke and must have instantly felt a cringe of regret – because the first thing he did was call his girlfriend's cell phone to talk about the fight they had the previous night.

114.   DECEDENT's girlfriend did not answer her phone.  So, DECEDENT called and called, becoming more desperate with each unanswered call.

115.   DECEDENT didn't have a car and didn't know for sure where his girlfriend was.  So, DECEDENT talked to his dad about what he should do – and decided he would walk to the south side of Massillon to where she worked.

116.   DECEDENT's dad cautioned DECEDENT to calm down because DECEDENT had a history of struggling with emotional problems and had made suicide threats to both the CPD and MPD in the past.

117.   DECEDENT then started to walk to Massillon becoming more and more despondent with each step.

118.   DECEDENT eventually became so despondent that he called the Crisis Center and told them that he was again having suicidal thoughts.

119.   Those calls created an instant reaction.  Canton Crisis Center called the Stark County Sheriff's Office and Deputy Dennis Betz was dispatched to locate DECEDENT.

120.    Betz had the Stark County Sheriff's Office dispatch center "ping" DECEDENT's phone. That resulted in locating DECEDENT somewhere on 16th Street SE in Massillon.

121.    The Stark County Sheriff's Office then called MPD to notify them of DECEDENT's unbalanced mental state and to see if they could help locate DECEDENT.

122.    Later, DECEDENT arrived in Massillon at the place his girlfriend worked – Great Clips hair salon located at 2757 Indian River Drive, SW, Massillon, Ohio 44646.

123.    DECEDENT entered the salon and asked for his girlfriend.  Unfortunately, DECEDENT's girlfriend was not working.  DECEDENT caused a disturbance when he learned that his girlfriend was not there.

124.    The disturbance caused a 911 call to be placed to MPD – but the caller hung-up before the operator answered.

125.    MPD dispatched a car to check on the 911 "disconnect".

126.    DECEDENT was still inside the salon when he saw the MPD cruiser pull up outside.

127.    On seeing the cruiser, DECEDENT retreated to a small 7'x10' interior room that the staff used as a lunch break room and Heather Patterson (a salon employee) accompanied him.

128.    The Massillon Police Officer (Sgt. Muntean) arrived and was informed that DECEDENT went inside the break room with a salon employee (Patterson).

129.    Sgt. Muntean immediately thought that an active hostage situation was on-going and notified his dispatcher.

130.    Later, Patterson informed officers that DECEDENT never hurt her and did not even touch her until the SWAT team stormed into the room.

131.    Other law enforcement units then began responding and surrounded the salon blocking all means of egress.

132.    Law enforcement officers from Massillon, Canton, Stark County Sheriff's Office and the

Ohio State Patrol were eventually at the scene.

133.    Defendant #6 (MCCONNELL) arrived and began talking to DECEDENT and negotiating

with him.

134.    Shortly thereafter, Defendant #5 (GREENFIELD) arrived and told MCCONNEL to

continue to negotiate with DECEDENT.

**POLICE ENHANCES DANGER TO DECEDENT**

135.    During the HOUR AND A HALF that MCCONNELL was negotiating with

DECEDENT, DECEDENT told MCCONNEL that he needed a cigarette and that

DECEDENT had left his cigarettes in the front of the store on a counter in a blue Walmart

plastic shopping bag.

136.    MCCONNELL located the blue bag and looked inside.

137.    Inside the blue bag was loose "rolling tobacco" cigarette tubes and a cigarette lighter.

138.    MCCONNELL took the bag and showed it to his supervisor – GREENFIELD.

139.    MCCONNELL and GREENFIELD then discussed whether they should attempt a trade

with DECEDENT.

140.    During this discussion, salon employees were nearby outside of the store.  However,

neither MCCONNELL nor GREENFIELD checked with them to see if a cigarette lighter

could be used by DECEDENT to endanger the building or people nearby.

141.    The break room in which DECEDENT was cornered had a natural gas hot water heater.

The natural gas meters and shut-off valves were located at the exterior of the building next to

the back door where MPD BOYER and Sheriff Deputy BETZ were stationed.  The shut-off

valves can be easily turned off, but no law enforcement officer ever turned off the gas. [See Exhibit "A" at Appx. 002-004]

142.    MCCONNELL and GREENFIELD decided that they would attempt to trade the blue bag, its contents including the cigarette lighter for any weapons DECEDENT had.

143.    DECEDENT agreed to the terms of the trade and opened the unlockable door to the breakroom and sat a pocket knife and scissors on the floor near the open door.

144.    Then after DECEDENT had relinquished whatever could be used as weapons, MCCONNELL sat the blue bag with the cigarette lighter on the floor next to the doorway.

145.    DECEDENT then retrieved the bag and began to roll a cigarette.

146.    At this time there were about nine MPD officers at the Great Clips salon.

147.    Some of these MPD officers were armed with "Taser" type devices that could produce a disabling shock on a suspect when used. [Exhibit "A" at Appx. 007.]

148.    The MPD officers who were armed with the "Taser" type devices had NOT received training on whether the device could ignite natural gas vapor.

149.    The MPD officers who were armed with the "Taser" type devices received training on whether the devices would pose a greater risk of igniting natural gas vapor than the muzzle blast from a handgun.

150.    Some MPD officers were in the front area of the salon.

151.    None of the MPD officers made any attempt to open the unlockable door and grab DECEDENT – even though DECEDENT was only one step away inside the doorway rolling a cigarette.

152.    Eventually, DECEDENT's girlfriend arrived at the salon and was interviewed by Stark County Sheriff Deputies and MPD officers.  It is from this interview that MCCONNELL obtained DECEDENT's cellular phone number.

153.    MCCONNELL then called DECEDENT's cell phone and asked to talk with Patterson who was still in the break room with DECEDENT.

154.    DECEDENT agreed and handed his cell phone to Patterson who began talking with MCCONNELL.

155.    During the MCCONNELL – PATTERSON telephone call, MCCONNELL asked PATTERSON if DECEDENT had any more weapons.  PATTERSON told MCCONNELL no that DECEDENT did NOT have any weapons.

156.    Upon learning from PATTERSON that DECEDENT was unarmed, GREENFIELD restrained his mean from stepping through the doorway and arresting DECEDENT.

157.    GREENFIELD then conferred with Defendant #4 (COVERT) and discussed calling the Canton SWAT team.  (Exhibit "A" at Appx. 007)

158.     COVERT agreed with GREENFIELD and GREENFIELD instructed Massillon Police dispatch to call Canton PD to have the Canton SWAT team come to Massillon to help with DECEDENT. (Exhibit "A" at Appx. 007)

159.    The City of Massillon and the City of Canton do NOT have adjacent borders, these two cities have at least one other jurisdiction between them at all points of their corporation limits.

160.    The City of Massillon has mutual aid agreements in place with other jurisdictions that protect MPD officers if they are injured while assisting another jurisdiction outside of Massillon.

161.    From time to time MPD officers have relied on the Mutual Aid agreements when assisting other law enforcement agencies outside of Massillon.

162.    The City of Canton has mutual aid agreements in place with other jurisdictions that protect CPD officers if they are injured while assisting another jurisdiction outside of Canton.

163.    From time to time CPD officers have relied on the Mutual Aid agreements when assisting other law enforcement agencies outside of Canton.

164.    At this time DECEDENT had already voluntarily surrendered his weapons and was unarmed as confirmed by PATTERSON.

## SEIZURE AND EXCESSIVE FORCE

165.    After receiving permission from COVERT, GREENFIELD contacted the MPD dispatcher and had a call placed to CPD to request the SWAT team. (Exhibit "A" at Appx. 007)

166.    Defendant #10 (BROUCKER) was the officer in charge at CPD at the time the request for the SWAT team was received.

167.    Upon learning of the request, BROUCKER immediately took action to activate the Canton SWAT team and instructed them to go to Massillon.

168.    Defendants #11, #12, #13, and #14 were the SWAT team members that headed to Massillon.  Some of these defendants drove CPD vehicles, but each of these defendants took CPD gear, uniforms, weapons, and bullets to confront DECEDENT in Massillon.

169.    Upon arriving at the salon, Defendants #11, #12, #13, and #14 briefly discussed DECEDENT's situation with GREENFIELD outside of the salon.

170.    GREENFIELD told Defendants #11, #12, #13, and #14 that DECEDENT had a cigarette lighter and was threatening to blow up the salon if his girlfriend did not come inside to talk to him.

171.    DECEDENT's girlfriend had arrived and talked to COVERT and GREENFIELD.  Both of those officer imprudently let the girlfriend talk to DECEDENT and even allowed her to enter the salon to call out to DECEDENT.  Unfortunately, the girlfriend's presence and actions had the predictable effect – it inflamed DECEDENT's passions, escalated the matter and made DECEDENT more adamant toward his desire to see his girlfriend.

172.     DECEDENT was calmly talking to his girlfriend on their cellular phones when Defendants #11, #12, #13, and #14 entered the salon.

173.    Upon entering the salon, Defendants #11, #12, #13, and #14 immediately walked to the breakroom doorway and took up positions.

174.    Just one minute after entering the salon, Defendants #11, #12, #13, and #14 without saying a word to DECEDENT, burst into the room and killed him.

175.    Defendant #11 was carrying bullet-proof shield (body bunkers) when he entered DECEDENT's room. (Exhibit "A" at Appx. 022-023)

176.    Defendant #11 (SALER) was the first team member into the room.  SALER took just one or two steps and slammed his ballistic shield into DECEDENT knocking DECEDENT off balance and too the floor.

177.    SALER then used the shield as a tomahawk and sliced down on DECEDENT's right side in an effort to drive the shield between DECEDENT and Patterson.

178.    The force exerted by SALER caused DECEDENT, Patterson and SALER to crumple to the floor in a heap with Patterson lying at the bottom of the pile.

179.    At or near the floor, SALER un-holstered his .40 caliber Glock hand gun, reached around

the shield, pressed the barrel against DECEDENT's side and fired a bullet through

DECEDENT's chest.

180.    SALER then pulled the gun back, reached over the top of the shield and pressed the

barrel against DECEDENT's temple and fired a bullet through his brain.

181.    GREENFIELD admitted he was relieved that SALER's muzzle blasts did not ignite any

natural gas.  (Exhibit "A" at Appx. 0012.)

182.    DECEDENT is the second person that SALER has killed.  In 2011 SALER shot and

killed 62 year old JIMMY JAMES in Canton, Ohio.

183.    COVERT and GREENFIELD knew of the JIMMY JAMES slaying and knew that

SALER had killed JAMES.  Even so, COVERT AND GREENFIELD did not give any

instructions to SALOR on how to deal with DECEDENT.  Instead, COVERT and

GREENFIELD just set SALOR loose on DECEDENT without any supervision.

184.    COVERT and GREENFIELD did NOT control the Canton SWAT team, did NOT give

them directions/guidance, and did NOT tell them what COVERT and GREENFIELD wanted

done.  Instead, COVERT and GREENFIELD merely pointed out where DECEDENT was,

said he had a cigarette lighter next to a natural gas source that he was threatening to ignite

and left Defendants #11, #12, #13, and #14 loose to do whatever they wanted to do to remedy

the problem.

185.    Defendant #13 (MILLER) was one of the SWAT team members that assaulted

DECEDENT and reported that he did NOT smell any natural gas vapor.

186.    MPD Sergeant MUNTEAN reported that the alleged hostage said that she did NOT smell

any natural gas vapor.  (Exhibit "A" at Appx. 019.)

187.    Defendant #6 (MCCONNELL) reported that he did NOT smell any natural gas vapor.

188.    Defendant # 12 (PELLEGRINO) was one of the SWAT team members that assaulted

DECEDENT and reported that he did NOT smell any natural gas vapor.

189.    MPD patrolman BROWN was also present during the stand-off and reported that he did

NOT smell any natural gas vapor.

190.    MPD did not check the qualification of Defendants ## 11, 12, 13 and 14, did not check

their training or their background for acts of violence before allowing them access to

DECEDENT.


**FIRST CLAIM FOR RELIEF:  42 U.S.C. §1983**
**Against All Defendants**

191.    Plaintiffs restate, re-allege and re-aver and hereby incorporate by reference each and all

allegations contained in the preceding paragraphs as if fully re-written and set forth herein.

192.    Defendants ##1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, have under color of state law

deprived Plaintiff of rights, privileges and amenities secured by the United States

Constitution, including *inter alia*, the Fourth, Fifth and Fourteenth Amendments to the

United States Constitution.


**SECOND CLAIM FOR RELIEF**
**SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER**

**Against Defendants ## 3, 4, 5, 6 11, 12, 13 and 14**

**Massillon Defendants**

193.    Plaintiffs restate, re-allege and re-aver and hereby incorporate by reference each and all

allegations contained in the preceding paragraphs as if fully re-written and set forth herein.

194.    Defendants ## 3, 4, 5 and 6 each violated DECEDENT's rights by causing or greatly increasing the risk of harm DECEDENT encountered without due process of law through Defendant's affirmative acts in violation of the substantive due process clause of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution; to-wit:

   a.  After learning that DECEDENT was emotionally/mentally disturbed and reportedly suicidal, these defendants cornered and confined DECEDENT inside a small 7' X 10' room.

   b.  While DECEDENT was so cornered and confined, these defendants gave a cigarette lighter to DECEDENT while defendants also supplied DECEDENT with constant quantities of natural gas.

   c.   While DECEDENT was so cornered and confined, these defendants – knowing that DECEDENT's unbalanced emotional/mental state was due to DECEDENT'S inability to talk to his girlfriend – brought DECEDENT's girlfriend inside the building made her presence known to DECEDENT but prohibited DECEDENT from having access to his girlfriend.  This action caused DECEDENT to become more unhinged, inflamed his passions, beclouded his mind thus escalating the danger DECEDENT encountered.

   d.  While DECEDENT was so cornered and confined, these defendants – knowing that DECEDENT's unbalanced emotional/mental state was due to DECEDENT'S inability to talk to his girlfriend – had DECEDENT's girlfriend call DECEDENT on DECEDENT's cellular telephone.  This action caused DECEDENT to become more unhinged, inflamed his passions thus escalating the danger DECEDENT encountered.

e.  While DECEDENT was so cornered and confined, these defendants, invited Canton SWAT into the City of Massillon, brought Canton SWAT to DECEDENT'S location and without giving SWAT instructions left SWAT use their own discretion in employing deadly force against DECEDENT – because DECEDENT had threatened to use the lighter these defendants gave him to ignite the natural gas that these defendants were providing him.

f.  While DECEDENT was so cornered and confined, these defendants, unlawfully attempted to abdicate their authority and their duty to protect DECEDENT to Canton SWAT and allowed SWAT to use unbridled discretion on the use of deadly force underpinning the use of that force to the fact that these defendants had given DECEDENT both access to a constant supply of natural gas and a lighter that could be used to ignite the gas.

g.  Defendants ## 3, 4, 5 and 6 used extra-jurisdictional independent contractors without checking their background, training or previous violent history.

195.  Defendants ## 3, 4, 5 and 6 each knew or clearly should have known that their actions specifically endangered DECEDENT because each of these defendants had DECEDENT confined/cornered in the small interior room within the Great Clips salon for at least an hour and a half.  Therefore, each of these defendants was unhurried and had time and opportunity for reflection and unhurried judgments concerning the actions they took as described hereinabove.

196.  Defendants ## 3, 4, 5 and 6 each acted with deliberate indifference to the enhanced harm they caused DECEDENT to encounter because in light of the above known

circumstances it was clearly unreasonable for these defendants to take the actions described hereinabove.

197.    Defendants ## 3, 4, 5 and 6 while acting under color of state law, breached their duty to DECEDENT by violating DECEDENT's rights as guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution be free from unlawful and unreasonable seizures when these defendants' acts greatly increased the risk of harm DECEDENT encountered.

198.    Defendants ## 3, 4, 5 and 6 proximately caused DECEDENT's harm and as a direct result of the above-described acts DECEDENT lost his liberty and his life.

**Canton Defendants**

199.    Plaintiffs restate, re-allege and re-aver and hereby incorporate by reference each and all allegations contained in the preceding paragraphs as if fully re-written and set forth herein.

200.    Defendants ## 11, 12, 13 and 14 each violated DECEDENT's rights by causing or greatly increasing the risk of harm DECEDENT encountered without due process of law through Defendant's affirmative acts in violation of the substantive due process clause of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution; to-wit:

   a.    After learning that DECEDENT was emotionally/mentally disturbed and reportedly suicidal, these defendants continued to corner and confine DECEDENT inside a small 7' X 10' room.

   b.    While DECEDENT was so cornered and confined, these defendants supplied DECEDENT with an unlimited quantity of natural gas while DECEDENT was in possession of a cigarette lighter that could be used to ignite the gas.

c.  While DECEDENT was so cornered and confined, these defendants chose to use deadly force against DECEDENT instead of "less than deadly force" such as Taser type devices and chemical munitions that were also available and ready at hand.

d.  While DECEDENT was so cornered and confined, these defendants assaulted DECEDENT's location and used deadly force against DECEDENT.

e.  While DECEDENT was so cornered and confined, these defendants, unlawfully usurped the police powers delegated by the State of Ohio to the City of Massillon and unlawfully /unreasonably used deadly force underpinning the use of that force to the fact that these defendants had given DECEDENT access to a continuing source of natural gas while knowing that DECEDENT possessed a lighter that could be used to ignite the gas.

201.  Defendants ## 11, 12, 13 and 14 each knew or clearly should have known that their actions specifically endangered DECEDENT because each of these defendants had DECEDENT confined/cornered in the small interior room with the Great Clips salon for a prolonged period of time.  Therefore, each of these defendants was unhurried and had time and opportunity for reflection and unhurried judgments concerning the actions they took as described hereinabove.

202.  Defendants ## 11, 12, 13 and 14 each acted with deliberate indifference to the enhanced harm they caused DECEDENT to encounter, because in light of the above known circumstances it was clearly unreasonable for these defendants to take the actions described hereinabove.

203. Defendants ## 11, 12, 13 and 14 while acting under color of state law, breached their duty to DECEDENT by violating DECEDENT's rights as guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution be free from unlawful and unreasonable seizures when these defendants' acts greatly increased the risk of harm DECEDENT encountered.

204. Defendants ## 11, 12, 13 and 14 each proximately caused DECEDENT's harm and as a direct result of the above-described acts DECEDENT lost his liberty and his life.

**THIRD CLAIM FOR RELIEF: WRONGFUL DEATH - OHIO REVISED CODE 2125.01**

**Against Defendants ## 4, 5, 11, 12, 13, and 14**

205. Plaintiffs restate, re-allege and re-aver and hereby incorporate by reference each and all allegations contained in the preceding paragraphs as if fully re-written and set forth herein.

206. Defendants ##4, 5, 11, 12, 13, and 14 are municipal police officers and are sued in their individual and official capacities. At all times relevant to this action, defendants ##4, 5, 11, 12, 13, 14 acted under color of state law.

207. Defendants ## 2, 3, and 4 are policymakers for the City of Massillon, and are sued in their individual and official capacities. At all times relevant to this action, Defendants ## 2, 3, and 4 acted under color of state law.

208. Defendants ##8, 9 and 15 are policymakers for the City of Canton, and are sued in their individual and official capacities. At all times relevant to this action, defendants ## 8, 9 and 15 acted under color of state law.

209.    The wanton or reckless acts or omission of Defendants 2, 3, 4, 5, 8, 9, 11, 12, 13, 14, and

15 directly and proximately caused the Decedent's death and the resulting loss of support,

society, services and mental anguish due to his death.

**FOURTH CLAIM FOR RELIEF:      FAILURE OF SUPERVISION, HIRING,
                                 TRAINING AND POLICIES**

**Against Defendants ## 1, 2, 3, 4, 5, 7, 8, 9, and 15**

210.    Plaintiffs restate, re-allege and re-aver and hereby incorporate by reference each and all

allegations contained in the preceding paragraphs as if fully re-written and set forth herein.

211.    Defendants ## 1, 2, 3, 4, 5, 7, 8, 9 and 15 supervised, authorized and ratified the wrongful

conduct of the Defendant Police Officers #6, 11, 12, 13, and 14.

212.    Defendants ## 1, 2, 3 and 4 negligently employed Defendants 11, 12, 13, and 14 without

interviewing them as to their training, qualifications, and violent histories.

213.    Defendant police officers #6, 11, 12, 13, and 14 wrongful conduct was the direct result of

the policies, practices and customs of Defendants ## 1, 2, 3, 4, 5, 7, 8, 9 and 15 that allowed

the Defendant Officers #6, 11, 12, 13, and 14 to unlawfully abdicate/usurp police powers

whereby extra-jurisdictional independent contractors are empowered to unlawfully and

unreasonably seize persons through the use of excessive force and to subject persons to

outrageous, unreasonable treatment causing serious injury.

214.    Defendants ## 1, 2, 3, 4, 5, 7, 8, and 9 failed to establish adequate policies and

procedures to properly train and/or supervise Defendant Officers #6, 11, 12, 13, and 14 on

the limits of their police powers, the appropriate use of force, and the physical training

needed to invoke an arrest.

215.    Defendants ## 1, 2, 3, 4, 5, 7, 8, 9 and 15 failed to establish adequate policies and procedures to properly train and/or supervise on physical training that would have enabled DECEDENT to be arrested without the use of deadly force.

216.    The acts and omissions by Defendants ## 1, 2, 3, 4, 5, 7, 8, 9 and 15 were the direct and proximate cause of Plaintiff's suffering and death in violation of Plaintiff's civil rights under the laws of the United States, Constitution of the United States, and the Constitution of Ohio.

217.    Defendants ## 1, 2, 3, 4, 5, 7, 8, 9 and 15 failed to properly enforce written policies designed to prevent the type of injury and death suffered by Plaintiff.

218.    The acts and omissions by Defendants ## 1, 2, 3, 4, 5, 7, 8, 9, and 15 were the direct and proximate cause of Plaintiff's suffering and death in violation of Plaintiff's civil rights under the laws of the United States, Constitution of the United States, and the Constitution of Ohio.

**FIFTH CLAIM FOR RELIEF:  EXCESSIVE FORCE**

**Against Defendants 4, 5, 11, 12, 13, 14, For Violating Decedent's Rights Under the Fourth and Fourteenth Amendments, and 42 U.S.C. §1983 To Be Free from Unlawful and Unreasonable Seizures**

219.    Plaintiffs restate, re-allege and re-aver and hereby incorporate by reference each and all allegations contained in the preceding paragraphs as if fully re-written and set forth herein.

220.    Force used by Defendants ##4, 5, 11, 12, 13, 14 was excessive and violated the 4th Amendment and the 14th Amendment of the United States Constitution which prohibits unreasonable search and seizures.

221.    Defendants ##4, 5, 11, 12, 13, 14 misconduct violated DECEDENT's right to be free from unlawful and unreasonable seizure as guaranteed by the 4th Amendment and the 14th Amendment of the United States Constitution.

222.    Consistent with the allegations above and to the extent not already alleged, Defendants ##4, 5, 11, 12, 13, 14  while acting under the color of law intentionally and with complete and deliberate indifference to the rights of DECEDENT caused DECEDENT to be deprived of his constitutional rights including but not limited to those under the Fourth Amendment by:

   (a) Unreasonably seizing DECEDENT without lawful authority. Thus depriving DECEDENT of his life and liberty without due process in violation of his rights under the Fifth Amendment.

   (b) Using a degree of force that was objectively unreasonable under the circumstances, and in violation of DECEDENT'S rights to be free of an unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution.

   (c) Subjecting DECEDENT to punishment without the benefit of a trial by jury in violation of his rights under the Sixth and Eighth Amendments;

223.    Defendants ##4, 5, 11, 12, 13, 14 misconduct directly and proximately caused DECEDENT to suffer permanent injury namely death as a result of said unreasonable seizure including but not limited to shock, emotional distress, conscious pain and suffering, attorney fees, and any and all other and further relief as this Court may deem appropriate.

**SIXTH CLAIM FOR RELIEF:    NEGLIGENCE, GROSS NEGLIGENCE AND RECKLESSNESS**

**Against Defendants ## 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14**

224.    Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

225.     Defendants ## 4, 5, 6, 11, 12, 13, and 14 each acted negligently, with gross negligence, with recklessness and/or intentionally, under Ohio law, by failing to assess the information provided to them, and for other acts and omissions that led to the killing of Decedent; to-wit:

a.  Defendants ## 4, 5 and 6 did not interview readily available hair salon (crime scene) employees to ascertain if any dangerous instrumentalities were inside the utility/breakroom where DECEDENT was located.

b.  Defendants ## 4, 5 and 6 knew that DECEDENT was emotionally/mentally unstable yet provided DECEDENT with a cigarette lighter while Defendants ## 4, 5 and 6 continued to provide natural gas to a water heater in the utility/breakroom in which DECEDENT was confined.

c.  The natural gas shut-off valves were accessible at the back door of the Great Clips salon and could have been easily used to shut off all gas to the salon, yet Defendants ## 4, 5, 6, 11, 12, 13, and 14 continued to provide natural gas to a water heater in the utility/breakroom in which DECEDENT was confined.

d.   Defendants ## 4, 5, 6, 11, 12, 13, and 14 had access to less than lethal instrumentalities (such as tear gas, and Tasers) yet chose instead to use deadly force when the muzzle blast from SALER's .40 caliber Glock handgun posed the same or greater danger of igniting any natural gas vapor that might have been present.

e.  Defendants ## 4, 5, 6, 11, 12, 13, and 14 allowed DECEDENT's girlfriend inside the hair salon (crime scene) and prompted her to talk to DECEDENT causing the situation to escalate.

f. After Defendants ## 5 and 6 traded the cigarette lighter to DECEDENT, Defendants 5 and 6 then talked to the alleged hostage via DECEDENT's cellular phone and learned that DECEDENT was unarmed; still Defendants 5 and 6 "held back" numerous MPD officers who were present from opening the unlockable door and taking the one to two steps inside the small "closet sized" room and arresting DECEDENT.

g. Defendants ## 4, 5 and 6 caused a request to placed to the Canton Police Department to send the Canton SWAT team to Massillon even though Defendants ## 5 and 6 lacked lawful authority to make that request.

h. When the Canton SWAT team arrived, Defendants ## 4, 5 and 6 pulled back the MPD officers that were present and handed control over the crime scene to the Canton SWAT team members (Defendants ## 11, 12, 13 and 14) to conduct their assault on DECEDENT.

i. In addition to handing control of the geographic crime scene over to the Canton SWAT team members, Defendants ## 4, 5, and 6 handed control over the discretion on how to confront and seize DECEDENT to Defendants ## 11, 12, 13 and 14 and were surprised that muzzle blasts from SALER's gun did not cause an explosion.

j. Defendants ## 4, 5, and 6 also gave the Canton SWAT team members (Defendants ## 11, 12, 13 and 14) control over the details, weapons, and methods of the way Defendants ## 11, 12, 13 and 14 would approach DECEDENT and seize him.

k. Defendants ## 11, 12, 13 and 14 did not attempt to speak to DECEDENT before storming in and killing DECEDENT.

l. Defendants ## 11, 12, 13 and 14 did not consider that lack of a natural gas odor or the fact that the MPD officers present did not smell any natural gas before carrying out the assault and killing of DECEDENT.

m. Defendants ## 11, 12, 13 and 14 did not shut-off the natural gas to the building when there was time to air out the building before carrying out the assault and killing of DECEDENT.

226. As a result of the foregoing, Defendants ## 4, 5, 6, 11, 12, 13, and 14 have, under color of law, deprived Decedent, of rights, privileges and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution including the right to be free of unlawful/unreasonable seizures and to be free from excessive force.

227. As a direct and proximate result of Defendants' actions that caused or led to the use of excessive and unreasonable force in this shooting, Decedent died and suffered other damages, and his survivors, next of kin and/or heirs have suffered damages, all as set forth above.

228. Plaintiff is further entitled to compensatory damages, punitive damages, interest, and their costs and attorneys' fees pursuant to 42 U.S.C. §1988 and due to the malicious, intentional and reckless acts of these Defendants.

**SEVENTH CLAIM FOR RELIEF:      NEGLIGENT SUPERVISION AND TRAINING**

**Against Defendants ## 1, 2, 3, 4, 7, 8, 9, AND 15.**

229. Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

230.    Defendants ## 1, 2, 3, 4, 7, 8, 9 and 15 each negligently failed to protect DECEDENT from harassment, abuse, assaults, and discrimination. Defendants' ## 1, 2, 3, 4, 7, 8, 9 and 15 negligent failure to protect DECEDENT from harassment, abuse, assaults, and discrimination was done in bad faith.

231.    Defendants ## 1, 2, 3, 4, 7, 8, 9 and 15 were negligent in failing to adequately train and supervise their employees and subordinates. Defendants' negligent failure to train and supervise was done in bad faith.

232.    As a direct and proximate result of Defendants ## 1, 2, 3, 4, 7, 8, 9 and 15 negligence deprived of his life and liberty and suffered physical and emotional injuries alleged in this complaint.

233.    Plaintiff requests that the court award compensatory damages in an amount to be determined according to proof by Plaintiff against Defendants ## 1, 2, 3, 4, 7, 8, 9 and 15 in their individual capacities.


**EIGHTH CLAIM FOR RELIEF:**         **GROSS NEGLIGENCE AND DELIBERATE INDIFFERENCE OF SUPERVISION AND TRAINING ON TACTICS CONCERNING EMOTIONALLY/MENTALLY DISTURBED PERSONS**


**Against Defendants ## 1, 2, 3, 4, 7, 8, 9, AND 15.**

234.    Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

235.    The Massillon State Hospital is a facility that treats mentally/emotionally disturbed patients and is located within the City of Massillon.

236.    It is a common routine for MPD officers to deal with patients that have "walked away" from the Massillon State Hospital.

237.    The failure of the Defendants ## 1, 2, 3, 4, 7, 8, 9 and 15 Cities of Massillon (Defendant #1) and the City of Canton (Defendant # 7), to provide training and supervision regarding the tactics concerning emotionally/mentally disturbed and suicidal persons law enforcement routinely and commonly encounter amounts to gross negligence and a deliberate indifference to the safety and lives of DECEDENT and the citizens of the cities of Massillon and Canton.

238.    The above-described gross negligence was a direct and proximate cause of the injuries DECEDENT suffered including his loss of liberty and life.

   **Lack of training and supervision regarding routine dealings with suicidal persons.**

239.    Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

240.    Defendant #5 (GREENFIELD) stated that the he and the MPD officers did everything they could think of.  (Exhibit "A" at Appx. 0012.)

241.    MPD Sgt. MUNTEAN admits that he (MUNTEAN) has dealt with a lot of people who are suicidal and that the he himself (MUNTEAN) goes on one suicidal call a week as most MPD law enforcement officer have. (Exhibit "A" at Appx. 0019.)

242.    Yet, Defendants ## 1, 2, 3, 4, 7, 8, 9 and 15 Cities of Massillon (Defendant #1) and the City of Canton (Defendant # 7), have NOT implemented a policy or procedure for identifying, reporting and responding to a "coachable" law enforcement event concerning suicidal persons.

243.    Even though officers routinely encounter suicidal persons on a weekly basis these Defendants have not provided for a thorough and comprehensive analysis and evaluation of

incidents/occurrences which would have enabled a quality review and risk reduction activities for such weekly encounters.

244.     Due to callous indifference, Defendants ## 1, 2, 3, 4, 7, 8, 9 and 15 Cities of Massillon (Defendant #1) and the City of Canton (Defendant # 7), have ignored the importance of quality review and risk reduction in the provision of law enforcement and mental healthcare service for the weekly encounters with suicidal persons.

245.     Given the fact that police must deal with suicidal persons weekly; the failure of the Defendants ## 1, 2, 3, 4, 7, 8, 9 and 15 Cities of Massillon (Defendant #1) and the City of Canton (Defendant # 7), to provide training and supervision regarding the importance of quality review and risk reduction in the provision of law enforcement services to such suicidal persons amounts to gross negligence and a deliberate indifference to the safety and lives of the citizens of the cities of Massillon and Canton.

246.     DECEDENT's Crisis Center Counselor was not called, the girlfriend was allowed to enter the salon and escalate the problem, an ignition device (cigarette lighter) was given to a suicidal person while he was standing next to a source of natural gas; yet, there is NO procedure to for quality review or risk reduction that would flag bad police practices so errors could be addressed and officers could be educated to guard against recurrence. Defendants callous indifference to the risks inherent in law enforcement encounters with suicidal persons amounts to gross negligence and was a proximate cause of the injuries to DECEDENT.

247.     The above-described gross negligence was a direct and proximate cause of the injuries DECEDENT suffered including his loss of liberty and life.

## NINTH CLAIM FOR RELIEF:    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Against Defendants ## 4, 5, and 6.

248.   Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

249.   When Defendants ## 4, 5, and 6 engaged in the above-described conduct, particularly in the presentment of DECEDENT'S girlfriend inside the Great Clips salon, flaunting her presence via cellular calls and then denying DECEDENT access to her repeatedly was designed to manipulate DECEDENT and cause him angst; Defendants ## 4, 5, and 6 did so deliberately and intentionally in order to cause plaintiff severe anxiety and severe emotional distress.

250.   Defendants ## 4, 5, and 6 employer's confirmation and ratification of the conduct of Defendants ## 4, 5, and 6 done with knowledge that DECEDENT's distress would increase, and was done with wanton and reckless disregard of the consequences to DECEDENT.

251.   The conduct of Defendants ## 4, 5, and 6 was outrageous and inflamed DESCEDENT's passions and escalated the situation.  That conduct constituted an intentional infliction of emotional distress against DECEDENT.

252.   As a direct and proximate result of the acts of defendants, DESCEDENT became upset, distressed, and aggravated, all to DECEDENT's damage because it resulted in DECEDENT being shot and killed by Canton SWAT team members.

**TENTH CLAIM FOR RELIEF:       NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**Against Defendants ## 4, 5, and 6.**

253.    Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

254.    Defendants ## 4, 5, and 6  acted negligently with the purpose of causing severe emotional distress to DECEDENT by their conduct toward DECEDENT, which conduct was outrageous, shocking and intolerable, and exceeding all reasonable bounds of decency.

255.    As a result of the above, DECEDENT was adversely affected in his health and wellbeing, was caused to sustained severe and permanent personal injuries and death; was caused to suffer severe pain and mental anguish

256.    As a direct and proximate result of the acts of defendants, DESCEDENT became upset, distressed, and aggravated, all to DECEDENT's damage because it resulted in DECEDENT being shot and killed by Canton SWAT team members.

**ELEVENTH CLAIM FOR RELIEF:       TITLE II AMERICAN WITH DISABILITIES ACT**

**Against Defendants ## 4, 5, 6, 11, 12, 13, and 14.**

257.    Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

258.    Title II of the American Disabilities Act ("ADA") provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

259.    A public entity includes any department, agency, special purpose district, or other instrumentality of a State, or States or Local Government.

260.    The language of title II tracts the language of §504 of the Rehabilitation Act of 1973.  It was Congress's intent that Title II extend the protection of the Rehabilitation Act to cover all programs of State or Local Governments regardless of the receipt of federal financial assistance in that it would work in the same manner as § 504.

261.    The statute specifically provides that remedies, procedures and rights available under § 504 shall be the same as those available under Title II.

262.    Section 504 provides that no otherwise qualified individual with a disability shall, solely by reason of his or her disability, be excluded from the participation and, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal or financial assistance.

263.    A program or activity includes all of the operations of a department, agency, special purpose district, or other instrumentality of a State, or of a Local Government.

264.    A disabled Plaintiff can succeed in an action under Title II if she can show that, by reason of her disability, she was either excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or otherwise subjected to discrimination by such entity.

265.    Various courts, have ruled that the encounter between a disabled individual and the police officer is determinative as to whether Title II will apply. There is consensus that when the situation is emergent and the officers have to make a split second decision, the application of Title II of the ADA is disallowed. However once an area is secure, and there is not a threat to

human safety, police officers are under a duty to reasonably accommodate the individuals disability in handling and transporting that person to a mental health care facility.

266.    Decedent called the crisis center repeatedly seeking mental help.  Once police cornered DECEDENT in the small closet sized utility/breakroom, he was confined therein for about one and a half hours.

267.    During that time, DECEDENT was not a threat to the police officers, until the police gave DECEDENT a cigarette and lighter and continued to supply the room with natural gas.

268.    Because of DECEDENT's mental disability, the police supervisors restrained other willing police officers from entering and peaceably arresting DECEDENT.

269.    Defendant police officers were afforded every opportunity to deescalate the situation, by shutting off the gas supplied to that room.

270.    Either through deliberate/intentional design, gross malfeasance or deliberate indifference to the rights of DECEDENT defendants caused the situation to deteriorate, which ultimately cost DECEDENT his life.

271.    As a direct and proximate result of the above-mentions acts DECEDENT lost his liberty and his life.

### TWELFTH CLAIM FOR RELIEF:    SURVIVORSHIP ACTION

272.    Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

273.    As Administratrix of DECEDENT's Estate, Plaintiff, CHERYL BEANS, brings this action for the injuries and damages to SHANE ALLEN RYAN prior to his death for the benefit of the ESTATE of SHANE ALLEN RYAN.

274.    As a result of the above-described misconduct of Defendants, DECEDENT suffered the injuries described in the above paragraphs, as well as incurring medical and hospital expenses.

275.    DECEDENT sustained conscious pain and suffering as a result of his injuries that ultimately resulted in his wrongful death.

## THIRTEENTH CLAIM FOR RELIEF: CONSPIRACY UNDER OHIO LAW

### Against All Defendants

276.    Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

277.    Said acts by the Defendants constituted the tort of civil conspiracy under Ohio law.

## FOURTEENTH CLAIM FOR RELIEF:  §1983 CONSPIRACY

### Against All Defendants

278.    Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully rewritten herein.

279.    The said acts by all Defendants constituted conspiracy to violate the DECEDENT's constitutional rights.  The Defendants combined and acted in concert, and entered into an agreement to injure the DECEDENT by unlawful means.  A plan was put in place to seize, shoot and kill DECEDENT, each DEFENDANT shared the objective to engage in these unlawful acts, and overt acts were committed in furtherance thereof.  A party alleging a §1983 conspiracy must plead their claim with a substantial amount of specific detail.  This complaint meets the legal requirement.

## MUNICIPAL LIABILIITY

280.    The said unlawful acts by the individual defendants herein were proximately caused by certain customs and policies existing in the MPD, the City of Massillon, the CPD and the City of Canton.  These customs and policies include, but are not limited to, failure to adequately and properly train law enforcement officers regarding the constitutional rights of citizens; failure to adequately and properly supervise and discipline employees.  Additionally, in this case the supervisory officers personally participated in, acquiesced in, ratified, encouraged and/or approved the alleged unconstitutional conduct.

## NO QUALIFIED IMMUNITY DEFENSE

281.    The individual police defendants are not entitled to avoid liability for their actions based upon the defense of qualified immunity. The legal rights which Defendants violated herein were clearly and particularly established prior to July 28, 2013.  Any reasonable police officer would have understood as of that date that is was unlawful to engage in the types of conduct alleged above.

## NO STATE IMMUNITY PURSUANT TO OHIO REVISED CODE CHAPTER 2744

282.    The individual defendants are not entitled to avoid liability for their actions based upon the defense of immunity provided by Ohio Revised Code Chapter 2744.  That chapter only applies to employees who are authorized to act for a political subdivision and does NOT include independent contractors.  The facts alleged hereinabove demonstrate that these two prerequisites for statutory immunity were not met.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury with the maximum amount of jurors allowed by law as to each and every claim so triable

/s/William E. Walker

William E. Walker, Jr. Esq. 0038703

## ATTORNEY FEES

Plaintiffs are entitled to recovery attorney's fees and costs as required by the Civil Rights Attorney's Fees Award Act of 1976.  49 U.S.C. §1988.  Plaintiffs hereby request that the Court and jury award them attorney's fees and expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants jointly and severally, individually and collectively in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00) for compensatory damages and for an award of punitive damages to be determined by the jury together with all costs incurred herein, reasonable attorney fees, pre-judgment and post-judgment interest, and any other relief the Court deems appropriate.

Respectfully submitted,

/s/William E. Walker, Jr.

William E. Walker, Jr., Esq. (0038703)
333 Erie Street South #192
Massillon, Ohio 44648-0192
330.327.2509
330.236.1826 [Fax]
williamwalker@gmx.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

CHERYL BEANS, individually and as
ADMINISTRATRIX
of the ESTATE OF SHANE ALLEN RYAN,

Plaintiffs,

vs.

CITY OF MASSILLON, *et al.*

Defendants.

CASE NO. _____

JUDGE: _____

**AFFIDAVIT**

STATE OF OHO          )
                      ) ss:
COUNTY OF STARK       )

TIMOTHY T. RHODES, being first duly sworn according to law, deposes and says:

1. I make this Affidavit on the basis of personal knowledge and am competent to testify concerning the matters set forth herein.

2. The attached Exhibits consist of :

   a. True and accurate photographs that I took at the scene of the Great Clips salon located at Indian River Drive, SW, Massillon, Ohio 44646.

   b. True copies of public records I requested from the Stark County Sheriff's Office.

FRUTHER AFFIANT SAYETH NAUGHT.

Sworn to and subscribed in my presence this 27th day of July, 2015.

_____
AFFIANT

_____
NOTARY PUBLIC

**WILLIAM E. WALKER, JR.**
ATTORNEY AT LAW
Notary for the State of Ohio.
My commission has no expiration.
Ohio Revised Code Section 147.03 .

**EXHIBIT "A"**                    **APPX. #001**



APPX. #002

EXHIBIT "A"



EXHIBIT "A"

APPX. #003



APPX. #004

EXHIBIT "A"

# INTERVIEW

# LT. JASON GREENFIELD

# CASE # 13-6967

APPX. #005

EXHIBIT "A"

LD = Lieutenant Lou Darrow
JG = Lieutenant Jason Greenfield

LD:     This is Lieutenant Lou Darrow.  Today's date 07-28-2013.  The day is Sunday.
        It's 2315 hours.  I'm speaking to Lieutenant Jason Greenfield, Massillon
        Police Department about an incident that occurred at 2757 Indian River
        Drive, Southwest.  Massillon PD's Case Number is 13-12829.  This incident
        ended in an officer involved shooting by Canton Police Department's
        Emergency Response Team.  Lieutenant, you want to tell us what happened
        today.

JG:     At around, uh, a couple minutes before 5 o'clock, 1655 or so, uh, I was at my
        desk on a, on a, uh, on the phone.  Heard my units get dispatched to, uh,
        Great Clips down on Indian River near Walmart.  I wasn't sure exactly what the,
        what the call was for, you know, I was, I was on the phone.  Uh, as the, my
        units were responding down there, dispatch called me here at my desk and
        asked me if I had any information on a Shane Ryan, if there was anything in
        our in-house computer, Interbadge, uh, reference him and that, that the
        Sheriff's Office was requesting the information.  I told her that as soon as I
        finished my phone call I would pull up my computer and call her back, or call
        whoever from the Sheriff's Department back and give 'em the information.  I
        hung up with dispatch, uh, less than a minute later I would say, I heard my
        officers, uh, were engaged in some type of problem at the call at Great Clips
        and were requesting back-up.  I heard an urgency in, uh, one of my sergeant's
        voice on the radio.  Uh, I disconnected my phone call and went out to my
        cruiser and, uh, immediately started to respond, go to the location.  In route I
        was able to make out that, uh, Sergeant Muntean was, was saying over the
        radio that he had an active hostage situation at Great Clips.  Uh, I think he said
        it three or four times on the radio.  And, uh, I immediately called Captain Peel,
        who is our acting chief, uh, didn't, he didn't answer his phone.  My next call was
        to Captain Covert.  Captain Covert answered and I filled him in on what I had,
        that I was responding, on my way there and that, uh, we had a hostage
        situation.  I told him that I would give him more information when I got there.
        When I arrived, um, my shift officer's were inside the business, had their
        weapon's drawn on and, and their attention was towards a door at the rear of the
        business that was shut and one of my officers was outside watching the rear
        door.  I was briefed on what, what was going on.  I was told that, uh, a suspect

APPX. #006

EXHIBIT "A"

**Page 2**
**Case # 13-6967**

JG: by the name of Shane Ryan was inside. He had entered the business and taken a hostage at knife point and some other employees and customers had fled when this happened and they were currently, uh, inside that small office, or what we, what we believed was a small office door. My officers were engaged in conversation with Mr. Ryan, uh, they were pleading with him to release the hostage, calm down, we'll get you help, uh, they were, you know, trying, trying to just, uh, maintain conversation with him. Uh, once, once I was briefed and realized all this, I gave, uh, I believe I gave Captain Covert a call back and let him know that it was a, it was a good hostage situation and that, uh, there was an, an active suspect that had a, a hostage in a, in a, locked in a room at, uh, Great Clips. Then he told me that he was responding to the location. Uh, dispatch had called me and told me that, uh, the suspects girlfriend was on the phone and she was responding to our location and I told her to re-contact her and tell her to stage basically at, uh, Goodwill, which is about a hundred yards from Great Clips and that we would, we would talk to her there and brief her and, and, and see if she could be of some help. Um, my officers continued to, uh, with their conversation with the suspect inside the room. They could, uh, I could also hear some of the conversation. Uh, I directed some of the officers to, uh, implement a taser, uh, if, if, if it, if the dynamic situation proved that, uh, he came out and the taser needed to be employed, I wanted officers to be ready with that so I had two officers with taser's ready to go. Other officers had their side arms out. Uh, I was there with a long gun. Again, I could hear most of the conversation, what was taking place and the suspect was extremely distraught. Uh, mentioned he wanted to kill himself, he wanted, uh, us to kill him, uh, he wanted his, his girlfriend to, to feel the pain and, uh, he was demanding that we get her to the scene. Again, they continued with the conversation. We were trying to buy some time. I called dispatched back and, uh, asked her, you know, what, uh, our options were as far as State Patrol and, uh, assistance from other agencies. She inquired, got back to me saying that the State Patrol had an SRT Team out that could be operational in about two hours. I advised her that, uh, that was a little bit too long and I told her to reach out to the Canton Police Department to see if they could, you know, what, if they could help us and when they could be operational. She got back to me and said it would be about thirty to forty minutes. Uh, I talked to Captain Covert and he said, yeah, tell 'em to get rolling, so I called dispatch back, told her to get them rolling. Um, during this time we learned that the suspect had left a blue Walmart bag on the front counter of the, of the business where we were staged watching the door. Inside

APPX. #007

EXHIBIT "A"

**Page 3**
**Case # 13-6967**

JG: the bag were some cigarettes, uh, like the kind you hand roll.  So it already had the filter and the paper, empty tubes, and it had some of the, the open tobacco sitting there.  He was wanting his girlfriend to come in and he said that he would exchange the hostage that he took, by the, her name was Heather.  He would exchange her for his girlfriend.  Uh, we negotiated, talked about that, um, told him that wasn't acceptable.  Uh, he mentioned that he did, uh, I believe he mentioned that he had edged weapons in there and, uh, we were able to talk him into relinquishing those ed, edged weapons outside the door in exchange for some cigarettes.  So we put together a small bundle of the, uh, the rolling machine, his, his papers and his tobacco and a lighter and traded that for what we believed was, you know, at least some of the edged weapons that he had.  Uh, when he did that, he left, I believe two pairs of scissors and, and an opened, I would say like a hunting knife or a locked back knife, it appeared to be new, like I said it was still open.  He set that outside, we collected those, put those on the counter.  Um, in and out, as I'm talking to dispatch, coming back in, talking to the captain's, coming back in.  My guys are briefing me on what's been said while I was out.  Uh, one of the things they mentioned is that he, he made mention of having a squirt gun compared to the weapons that we had on him outside, so, something like it's not even gonna be a fight when I come out there, I have a squirt gun compared to what you guys have.  Uh, I believe it was Officer Edwards that told me that.  Uh, so we weren't entirely sure of what weapons he still had.  We did know that he gave up some of, some edged weapons.  Continued to hear, every once in a while, Heather would, would make some noise.  Uh, we would ask to hear her and she'd say I'm in here and I'm okay.  Uh, she was crying a little bit every once in a while but mainly she was, she was quiet.  He was doing a lot of the talking.  Uh, continued to have conversation with him, continued to buy time and his girlfriend, Taylor, showed up.  Uh, one of the Sheriff's Office Deputies met with her in the parking lot of Goodwill where they established contact via telephone.  We could hear him talking to her over the telephone from inside the office.  He was yelling at her, you put me here.  I want you to feel this pain.  Uh, saying things like that.  I'm not sure what she was saying, she was over in the, in the parking lot of Goodwill.  Uh, those, that, that, you know, she, she was told, you know, I, I told the Sheriff's Office to get her to plead with him to let the hostage go, let Heather out of there, and I believe she did and, and he did not.  Uh, those communications broke down and I believe it was mainly because I wasn't sure that he believed that she was actually on the scene 'cause he was talking to her on the phone.

APPX. #008

EXHIBIT "A"

**Page 6**
**Case # 13-6967**

LD:  And this was all at Great Clips?

JG:  Correct.

LD:  And you're in charge until Captain Covert showed up?

JG:  Correct.

LD:  And how long was he on scene before the Emergency Response Team shows?

JG:  Um, boy, you know, we were there from 5 o'clock, or a couple minutes til until, you know, I think it was 7 o'clock before I released my officers, you know, back to their patrol duties, so it was two hours.  I'd say, I'd say Captain Covert got there shortly after I got there.  You know, I got there, I think ten minutes after 5, Captain Covert might have showed up maybe ten minutes after that, I'm not sure.  If I could refer back to his call card I'll see if he signaled out.  No, I don't see him signaling out on the call card, but he, yeah he was, he was there pretty quick and, um, then I think it was.....

LD:  But he's there and briefed?

JG:  Oh yeah, and him and I were both, both working it together, you know what I'm saying?.....

LD:  Sure.

JG:  I'd, I'd, I'd be talking to dispatch, getting information from Canton or OSP while he's, you know, briefing, uh, the Interim Chief or, or he may have been talking to the Sheriff at the time requesting assistance and we're both kind of, we're there sharing information and guiding the officers that were on the door.

LD:  And there's no doubt in your mind that he is manipulating the gas or trying to do something to the natural gas supply to the building?

APPX. #009

EXHIBIT "A"

**Page 7**
**Case # 13-6967**

JG:  No. And one of the reasons is because when we were coming back over from bringing the SWAT Team over, the urgency in all my guys voice, you know, he's got the gas on, he's got the, he's turning the gas on, he's turning the gas on. And ~~McConnell~~ looks at me and says I talked to the girl, I said let me talk to her to see if she's okay, he gave her the phone and she said, I asked her is he turning the gas on and she said yes. And he said he asked her if he had any more weapons and she said she didn't believe he did.

LD:  When you say the girl, we're talking about Heather who was the actual hostage...

JG:  Correct.

LD:  ...who's in there watching....

JG:  Yes.

LD:  ....this happening?

JG:  Yes, because the suspect had a cell phone and, and I'm gathering from what ~~McConnell~~ told me, at one point, um, he handed the phone over to the hostage to see, to, to, let me talk to her, let me see if she's alright, you know, let me talk to her on the phone. And she says to him, on the phone, I think he asked her, you know, what's going on, is he turning the gas on, and she said yes. And I, there was, you know, there was this, uh, I could hear the suspect talking too when we came back in. The times ticking, the times ticking. And they're telling me, they said he told us fifteen minutes he's gonna blow, like fifteen minutes, you know. So we, we, there was no doubt in my mind that gas was filling in that room and, and, and his plan was to, was to go like that. I think he thought because he couldn't, he couldn't manipulate us and get us to switch out the hostage with his girlfriend, that he was gonna try to take us all 'cause he heard her voice there, he figured she was still on scene so he figured he'd get her, him, us, you know. He didn't care about the hostage at all. We talked to her, you know we talked to him about the hostage, her having kids, she's got a family, you know, I believe he had kids, we mentioned them, you know. We tried everything. Just about every angle that we knew we could try and that we were trained to do, I'll tell you that. But, yeah, there was no doubt in my mind.

EXHIBIT "A"

**Page 8**
**Case # 13-6967**

LD:    Right and you could tell by the urgency in the hostages voice, and in the way that your patrolman that you work with everyday, and you knew how they were going to react, there was a sense of urgency....

JG:    Oh, yeah, my patrolman....

LD:    ...there was no....

JG:    ....wanted to breach the door.

LD:    ...there was no other option?

JG:    Right.  They didn't, they, my patrolmen wanted to breach that door.

LD:    Is there anything else you think you need to add to this?

JG:    Uh, only that I remember requesting, once they got in and, and, and worked on, once, once, uh, the hostage come running past me, there was, there was the, the SWAT Team element went in, two shots were heard, the hostage comes running past me, um, they called clear room.  I step into the room and I could, I thought I could smell and taste the gas in the room, you know what I mean?  And we started kind of like, we're opening doors and we're knocking saying we're coming out 'cause we're gonna open these doors and get some air in here.  And once, once the FD guy's got in there and got the suspect up on the gurney and got him out, I actually requested another FD guy to turn the gas off, whatever he turned on, I need someone to take a look and turn the gas off.  And I wanna say it was Dave Wood was the, was the fireman, Massillon Fireman, that either said he got something or found it or was looking for it or, or, you know, fix something, he, he did something in there as it, it relates to the gas being on.

LD:    Did the Emergency Response Team members, did they have gas masks on?

JG:    No, they didn't.

LD:    Okay.

APPX. #011

EXHIBIT "A"

**Page 9**
**Case # 13-6967**

JG:     No, but I remember them also mentioning that they smelled gas.  And everyone
        was kind of relieved that the flash didn't, you know, ignite or whatever.  But it
        went from, it went from, okay we're talking, we're getting resources here, you
        know what I mean, you know this guys clearly upset, you know, we're, we're
        about to the point where we've exhausted everything that we can think of, he
        knows he's not gonna get his girlfriend in there.  It went from that to a hundred
        miles an hour we need a, we need to get in there now, there's, you know, he's,
        he's choosing to force us in there right now.  And I don't know if that was his
        plan or what, you know what I mean?  It happened pretty fast.

LD:     I know you're having knee surgery tomorrow.

JG:     Correct.

LD:     So after that's complete, and you're back up on your feet, if I have any other
        questions or anything, I can contact you again?

JG:     Absolutely, yeah.

LD:     Great.  The time is 2339.  The Sheriff's Office Case Number  on this is 13-6967.
        End of tape.


Transcribed by:

C. Wareham, Unit 135
July 29, 2013

APPX. #012

EXHIBIT "A"

# SERGEANT BRIAN MUNTEAN

# INTERVIEW

# CASE # 13-6967

APPX. #013

EXHIBIT "A"

LD = Lieutenant Lou Darrow
BM = Sergeant Brian Muntean

LD:  This is Lieutenant Lou Darrow.  The date is  Monday, 7-29-2013, at two minutes.
We're at Massillon PD investigating an incident that occurred at 2757 Indian River
Drive, Southwest, which is a Great Clips.  In the room is myself and Sergeant
Brian Muntean of Massillon Police Department.  Sergeant Muntean was the first
officer on the scene which started out as a trouble call and ended up into an
officer involved shooting.  He's going to explain his part in what he witnessed
during this incident.

BM:  Um, yeah, we got a, uh, 911, uh, call from a cell phone, I verified on the radio that
it was from a cell phone, in the area of the Great Clips down by the Walmart and
across from Starbucks.  Um, so I was on State Route 21, um, and I was fairly
close, uh, right around Walnut Road, somewhere in there, and I, um, picked my
speed up a little bit and started, uh, running emergency, uh, lights only, 'cause I
didn't know exactly what I had down there.  But, uh, I was, the dispatcher came
back on the radio and updated me about when I was about ready to get off the
Erie Street exit I recall, maybe just, uh, five hundred feet, maybe north of that, um,
which was, which was very close to the location of the incident.   Um, a call went
out, or the update come out that, uh, there was some kind of disturbance, it
wasn't just a 911 hang up call, there was something going on.   And I remembered
language on the radio traffic, something to the effect of, um, there was a male
there, a disturbance, and he didn't, he didn't wanna leave.  Um, so I, uh, turned
the corner onto, uh, Erie Street, South or Indian River there, and pull in, I guess it
would be on the southeast corner of the business.  Um, when I pulled in, I signaled
out on the radio and I did see, um, the description of the, of the male involved I
remembered they, that he did have some type of bag in his hand and it was a
white male.  Uh, when I pulled up, there was a white male, uh, he was walking
eastbound from the business, um, and he did have something in his hand although
I could not see what it was, so I focused my attention on him.  He was walking
eastbound towards the parking lot where the cars would park, uh, for that
business.  So, I believe I signaled out, I'll be out with a subject, um, and, uh, I tried
to get the guy's attention.  It appeared to me that he was, uh, purposely not looking
at me, um, I was in a marked car, I was going pretty fast, I should have been
noticeable, um, and he was not looking towards me so that did catch my
suspicion a little bit.  And I, uh, said something to him to stop and he kind of looked
at me as he was confused.  Um, so once I, at that point I kind of realized that
maybe this wasn't the guy, maybe he was just a legitimate customer.  Well at that

APPX. #014

EXHIBIT "A"

**Page 2**
**Case # 13-6967**

BM: point, when I'm going to get out of my car, I hear some screaming coming from the front of the business.  I walk, I see, um, a, um, one of the managers are, or one of the workers come running out the front and she's waving me frantically that something's going on inside her business.  Um, and at that point I started trying to ask her some questions but she yelled something about he's, he's got her in here, she's a hostage, and I, and she said he had a gun and a knife.  So, uh, at that point, um, I went towards the front of the business and I did, I got on my radio as well and I said, you know, there's a possible hostage situation down here, suspect is somewhere inside with, with, with a hostage and there's supposedly, and I believe I said something about a firearm and, and, and knife being possibly involved for the responding cars.  And I asked that somebody go around to the north side of the building because I wasn't sure if there was access in the back or what have you.  So it was probably, I mean I had tunnel vision, but it was probably a minute and there was other units there.  In the meantime, when I went towards the front of the, front of the store, uh, the windows are, are a little hard to see in just by the way they are, um, the material they use in the windows, or whatever, but, uh, and, and the, the way the sun was, it was, it was, I could barely see inside but I could see there was something going on in there.  I could see that there was some kind of commotion.  I saw somebody running across, frantically running across.  So at that point I went ahead and went in the front door and by the time I got in the front door, I saw him running and closing one of the doors with, with her, you know, in front of him.  And then he started screaming, um, she's, she's gonna die, don't come any closer, I got a knife.  She's, and she's screaming frantically like, you know, she was very, very scared.  And, uh, and at that point, like I said, I got a lot more, um, additional units there at that point and we kind of took cover, uh, inside the, um, business, you know, the best we could based on the lay out.  We took some cover, we were probably about fifteen to twenty feet away from the, um, suspected room where they were at, we could kind of tell by their voices where, where, which room he was in.  Um, uh, he, uh, kept saying that he wanted his ex girlfriend there.  He wanted her there and that was the only way that we were gonna get the hostage out safely.  And he said several times he had a knife, he mentioned at least two times, made the mentioned of suicide by cop that I heard.  Um, he, uh, was not, he wasn't working with us that's for sure.  At one, at one point, you know, we, you know, we asked him, you know, bring, open the door and put the weapons out.  He wanted some cigarettes.  We said okay but at least put the weapons out.  We were trying to get the girl out, but he wouldn't have that and so he wanted a cigarette real bad so at one point he put the, he opened the

EXHIBIT "A"

APPX. #015

**Page 3**
**Case # 13-6967**

BM:  door for just a fraction of a second and he only opened it about, if I had to give it
     measurement, I'd say like and inch or two max.  I could barely even make out him
     let alone anybody else.  Um, so he, and he made mention several times that he
     saw our lights, I think he may have been referring to the laser lights on the, on the
     firearm, the firearms that we were using.  Um, But he was just getting more
     frustrated, more frustrated.  He, uh, he made mention several times that, you
     know, this is only going to end one way.  And it seemed like no matter what we
     did or offered he, the only thing he was, the only thing he wanted was he wanted
     his ex girlfriend back in that room with him and that was it.  And he said anything
     other than that, I mean we, we tried and tried and tried, he was not having, the
     only thing he, we got him to successfully do was to throw the, the knife and the,
     um, screwdriver and little, uh, pair of scissors I believe he had out the door.  That
     was the only thing that we got him to do.  Um, at one point, I wanna say it was
     probably like no more than like five minutes or seven minutes into the time we
     were there, I know it was, uh, I believe Lieutenant Greenfield made a call to get
     an SRT Team, um, out there ASAP and advise them of the situation.  Um, I think
     initially they said that we had about a thirty five minute ETA I believe they said.
     Um, so we knew they, we knew that we had them coming, um, and, uh, then at
     one point he said, this was later during negotiations, this is probably a good, if
     I, it's hard to put the time together but I'm thinking like a half hour into it at one
     point, he said I'm, I'm gonna start a timer and he said and I'm gonna set it for
     twenty minutes and then he said, and, and he made mention of something about
     gas and then something about having a lighter and he's gonna blow the f'en
     place up.  Then he was, his voice was going higher and higher like he was
     getting agitated, like, you know, some, he says this is not gonna go on all night,
     this is how it's gonna end, you know.  And, uh, he made mention that he
     watches the movies all the time he knows all about negotiations.  And, um, so at
     one point we knew that, um, we knew that they were, you know, they were still
     on their way, and he had mentioned this thing about twenty minutes, so at that
     point I asked somebody, I said, you know, what's the ETA on the SRT Team and
     I believe some, and then someone told me about five minutes.  Well he just told
     us twenty minutes on the timer which was good for us.  So I would say no more
     than two minutes they were on scene.  They got there very fast.  Um, and once
     they arrived on scene, they were right in the front door I believe, uh, Greenfield,
     I believe somebody briefed 'em outside as to the gas and the lighter and the
     threat of blowing the place up.  And they weren't in the building more than, I would
     say somewhere between fifteen or thirty seconds and said everybody back up a

EXHIBIT "A"

**Page 4**
**Case # 13-6967**

little bit and I believe three of our MPD Officer's were just right behind 'em, two or three, I was one of 'em.  And, uh, I was probably about ten feet behind 'em when they went through the door.  And they went in and went to the right and I would say they weren't in there longer than, uh, gosh, two seconds and I heard two shots.  And, uh, then I, I went in behind 'em and then, uh, I saw the, um, suspect on the ground, um, he appeared to be DOA, um, wasn't moving or anything.  And, uh, I saw some blood and, uh, they were, you know, screaming get, get her out of here, get her out of here, so we got her out of there.  I went out with her, um, and got her out of there and, uh, and then at that point, uh, I went out and, um, got a squad, there was a squad out there and they kind of wanted to, well actually, actually first we had to wave the FD in 'cause they were, they were like seconds away or whatever, but we waved them in.  They, uh, they got, they, uh, got there real quick, I jumped and grabbed their squad, took it around to the back and they loaded him in there.  And then once they loaded him in, I went out and interviewed the girlfriend, or the ex girlfriend I'm sorry.  I interviewed her.  I took a written statement from her and, uh, then eventually I went up to the, uh, emergency room and took photographs of the deceased and, um, interviewed the, uh, hostage, victim.  I interviewed her along with, uh, your officer, Lieutenant Oliver and, uh, recorded it and you guys will be getting copies of that tomorrow 'cause I have to burn that, I have to burn that, have our evidence officer burn it onto a CD.  And, uh, that's about it.

LD:  About what time did this start?

BM:  Um....

LD:  (Cough)...Excuse me.

BM:  I'll have to, this is the best report, oh I'm sorry.  Okay, I believe, you know, we would have got the call right around, um, 5 o'clock, slightly before.

LD:  Just before 5:00 P.M. or just before 1700 hours on....

BM:  Just before 1700 hours, uh.

LD:  Sunday.

EXHIBIT "A"

**Page 5**
**Case # 13-6967**

BM:  Yeah, Sunday night, Sunday evening, yes.

LD:  And about what time does the SRT Team show up?

BM:  Um, I would have to say they were right around, uh,....

LD:  If you don't remember.....

BM:  It was, it was, it was roughly right around, I wanna say like a half hour, forty minutes after it initially started, you know.  I can't find the actual.

LD:  That's good enough.

BM:  Yeah.

LD:  You were telling me earlier that you're department has actually had contact with the suspect in this before?

BM:  Yes we have.  Um, on, um, Case, Case Number 13-9542, uh, filed by Officer Jim Baumgarnder Unit 94 on the 9th of June at 11:53 AM.  Um, they were dispatched to 1216 Erie Street, South to assist the FD with a suicidal male.  The suicidal male was this subject that we dealt with today.  Um, he was holding a knife to himself threatening to take his own life and, uh, subsequently, um, he had to be tased by Officer Ellis so he ended up going to the emergency room and I believe he was charged with disorderly conduct as a result.  But, yeah, he has a history of suicidal behavior.  I believe he had also contacted his, I believe he had also called out at the crisis center today as well about the same thing, um, I interviewed the, uh, the ex girlfriend who was, you know, she was there with us pretty much the entire time.  We had her off to the side in the safe zone but she could hear what was going on because at times we had to have her communicate with him.  And, uh, you know, I interviewed her and she, she, she said he was, he was, you know, he was set on self destructive behavior, there was just, there was no two ways about it.

LD:  Did she tell you, was he on any medications or?

BM:  Uh, no we didn't talk about that.

APPX. #018

EXHIBIT "A"

**Page 6**
**Case # 13-6967**

LD:  You also interviewed the hostage in this?

BM:  Yes.  Yeah, I just interviewed her this evening at the Massillon Affinity Hospital in their ER wing in, uh, room 20 I believe she was in. Um, recorded that interview with, uh, um, audio video.  Uh, Lieutenant Oliver conducted most of the interview, I just asked maybe a few questions.  Um, but, uh, you know, she, she gave the, you know, the same synopsis that she got, you know, she said she was absolutely positively in fear for her life the entire time.  Um, and, and a matter of fact she, she thanked us numerous times, um, for being there and for saving her life.  That's the way she put it.

LD:  During your interview with her did she state that he was doing something with the natural gas supply...

BM:  Yeah.

LD:  ...in the room?

BM:  Yeah, she, uh, she indicated that he had, uh, once he had given, you know, the weapons, he gave the knife to us and the scissors and the other object, he gave, he gave to us, you know, he had, at least he didn't, I mean who knows what was back there that could be used as a weapon, but apparently he saw that and thought of it.  And she said he reached down there and he, and he, and he, she said I saw him switch, switch over the valve.  And I asked her if she ever heard gas or did she ever smell gas and she said no I don't even know what it smells like but I watched him do it.  And I thought she said he had more than one.  So he said he had the lighter and he was gonna blow everybody up.

LD:  Is there anything else you think needs added to this?

BM:  Um, you know I've dealt with a lot of people who are, you know, so called suicidal's, I mean we probably go on, I probably go on one a week with just myself as most law enforcement Officers have, I mean, you know, you deal with attention seekers all the time, people that just have problems and they, they're looking for attention and they want help and that's fine, that's our job.  Um, but, uh, I told everybody at the scene that day when we were there and we were all lined

EXHIBIT "A"

APPX. #019

**Page 7**
**Case # 13-6967**

BM: up around the door, you know, I, you know we work with some, some younger
officers that have probably never been on a situation like that before, and I said,
um, you know, I've been on a lot of these, I said I'm telling you, and get it in your
head right now, be ready, be ready to use deadly force because my opinion is this
guy only wants one thing, he wants, he wants his ex girlfriend to see him die and
or he wants to get at her.  There's only two reasons why he wants her here.  And
we, like I said, we even offered, which is probably maybe a little bit over the top,
but we even said, you know, put the guns out, get the victim hostage out and we
will actually walk, of course we would go in first, we'll walk her in, we'll talk about,
we'll talk, we'll let you talk to her.  You know, even if we arrested him, we would
have, we would have, I would have let him, fine, you wanna say a few words, sure.
He didn't want that okay.  He wanted to do harm to her and or to himself and, and
I think he wanted her to see that happen.  That's, that's pretty much everybody's
opinion that was there.  And, uh, that's what I told the guys there, I said be ready
'cause he ain't, he ain't playing.  You know we talked to him for a long time and we,
and we kind of, you can kind of tell after you go back and forth with people what
they're, what their intent is.  So I think the, uh, think the, uh, SRT Team did, did an
awesome job and did what they had to do.

LD:  Did you hear any dialogue between the team leader and the suspect?

BM:  Just, it just happened, it was literally two seconds, it was….

LD:  There was no time for that?

BM:  There was, I mean there, there may have been dialogue, um, it may have been
tunnel vision kicking in, I don't know, but I just know they were in there quick, it
was two seconds and I heard a bunch of yelling and screaming, I mean everybody
was screaming, she was screaming, it's, it's, you know, that quick.  I think part of
the reason, he said that radio went off and I think they could hear that and
maybe he was positioning himself or whatever, I don't know, but he got in and it
was over quick.

LD:  Okay, if I have any other questions, I can come back?

APPX. #020

EXHIBIT "A"

**Page 7**
**Case # 13-6967**

BM: Oh absolutely, yeah, yeah, absolutely.  Um, my card I gave you has email on it, I don't know if you guys have departmental email, um, that's the best way to get a hold of me 'cause I'm always, like half the time I'm never even here.  Um, I can write my cell on there though if you want, that way you can get a hold of me wherever I'm at.

LD: That would be good.  Okay, it is Monday, 7-29-2013 at 23 minutes.  We're gonna conclude it.

Transcribed by:

C. Wareham, Unit 135
July 30, 2013

APPX. #021

EXHIBIT "A"