# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL BEANS, Individually and as Administratrix of the Estate of Shane Allen Ryan, | ) ) ) | CASE NO. 5:15-cv-1475 |
| | ) ) | |
| PLAINTIFF, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | |
| CITY OF MASSILLON, et al., | ) ) | MEMORANDUM OPINION |
| | ) ) | |
| DEFENDANTS. | ) | |

Before the Court are the following dispositive motions: (1) the motion of defendants City of Massillon ("Massillon"), Kathy Catazaro-Perry ("Catazaro-Perry"), William Peel ("Peel"), Paul Covert ("Covert"), Jason Greenfield ("Greenfield"), and David McConnell ("McConnell") (collectively "Massillon defendants") for summary judgment (Doc. No. 46 ["Massillon MSJ"]; (2) the motion of defendants City of Canton ("Canton"), William Healy II ("Healy"), Bruce Lawver ("Lawver"), David Davis ("Davis"), Lisa Broucker ("Broucker"), Charles Saler ("Saler"), Donald Miller ("Miller"), Travis Pellegrino ("Pellegrino"), and Brandon Shackle ("Shackle") (collectively "Canton defendants") for summary judgment (Doc. No. 48 ["Canton MSJ"]; and (3) the motion of plaintiff Cheryl Beans ("plaintiff" or "Beans") for summary judgment (Doc. No. 49 ["Plaintiff MSJ"]). The motions are fully briefed. (*See* Doc. No. 58 (Plaintiff's Opposition to Massillon Defendants' Summary Judgment Motion ["Massillon MSJ Opp'n"]); Doc. No. 84 (Reply Brief in Support of Massillon Defendants' Summary Judgment Motion ["Massillon MSJ Reply"]); Doc. No. 60 (Plaintiff's Opposition to Canton Defendants' Summary Judgment Motion ["Canton MSJ Opp'n"]); Doc. No. 83 (Reply Brief in Support of

Canton Defendants' Summary Judgment Motion ["Canton MSJ Reply"]); Doc. No. 55 (Massillon Defendants' Response to Plaintiff's Summary Judgment Motion ["Plaintiff MSJ Massillon Opp'n"]); Doc. No. 67 (Canton Defendants' Response to Plaintiff's Summary Judgment Motion ["Plaintiff MSJ Canton Opp'n"]); Doc. No. 85 (Reply Brief in support of Plaintiff's Motion for Summary Judgment as against Canton Defendants ["Plaintiff MSJ Reply-Canton"]); Doc. No. 86 (Reply Brief in Support of Plaintiff's Motion for Summary Judgment as against Massillon Defendants ["Plaintiff MSJ Reply-Massillon"])).

For the reasons to follow, the motions of Massillon defendants and Canton defendants for summary judgment are granted, and plaintiff's summary judgment motion is denied.

## I. BACKGROUND[1]

The tragic events that supply the foundation for the present civil rights action were set in motion with a walk. On July 28, 2013, Shane Ryan ("Ryan" or "deceased") called his ex-girlfriend[2], Taylor McLendon ("McLendon"). Unable to reach her by phone, Ryan decided to walk 10 miles to the Great Clips Hair Salon in Massillon, Ohio, where McLendon was employed. It is undisputed that, along the way, Ryan placed a called to the Crisis Intervention and Recovery Center ("Crisis Center"). Given the distressed nature of Ryan's call, a representative of the Crisis Center contacted the Stark County Sheriff's Office and reported the call. Using GPS tracking technology or triangulation, the Stark County Sheriff's Office was able to determine that Ryan was in Massillon. (Doc. No. 71 (Deposition of Jason Greenfield

---

[1] For purposes of framing the issues raised in defendants' summary judgment motions, the Court takes the facts supported by competent evidence in a light most favorable to plaintiff. In doing so, the Court notes that many of the facts relied upon by plaintiff are either unsupported by the record or supported by incompetent evidence that the Court may not consider on summary judgment.

[2] It is unclear from the record whether McLendon and Ryan were currently in a romantic relationship at the time of the shooting, or whether any such relationship had previously ended. For purposes of summary judgment, it is a distinction without a difference.

["Greenfield Dep."]) at 2050-52.[3]) The sheriff's office contacted the Massillon Police Department and requested assistance in locating Ryan. (*Id.* at 2050-51.)

While local law enforcement was looking for him, Ryan arrived at the salon only to discover that McLendon was not there. What happened next is disputed, but the parties agree that the customers present in the salon vacated the building and one of the salon's employees, Heather Patterson ("Patterson"), ended up with Ryan in a small room in the back of the salon.[4] Shortly after the customers left the store, some unidentified person placed a 911 call from the salon to the Massillon Police Department and hung up. Responding to the call, Massillon police were dispatched to the salon. (*Id.* at 2053.)

Sergeant Brian Muntean ("Muntean") was the first Massillon police officer to arrive at the scene. Once there, Muntean radioed dispatch and, with "a lot of stress in his voice," requested backup advising that a hostage situation had developed at the salon and that the suspect was possibly armed with a gun. (Greenfield Dep. at 2063; Doc. No. 69 (Deposition of David McConnell ["McConnell Dep."]) at 1952.) Greenfield was the Massillon officer in charge

---

[3] All references to page numbers are to the page identification numbers generated by the Court's electronic filing system.

[4] Plaintiff has suggested in briefing that Heather Patterson willingly went with Ryan to the utility room. All of the evidence in the record, however, demonstrates that Patterson was a hostage, held in the back room against her will by Ryan. For example, officers consistently testified in their depositions that Patterson could be heard, at various times, whimpering or crying. (Greenfield Dep. at 2138; *see* Doc. No. 69 (Deposition of David McConnell ["McConnell Dep."]) at 1956.) Ryan also made repeated threats to kill Patterson, and even inquired about exchanging Patterson with McLendon. (Greenfield Dep. at 2079; Doc. No. 62 (Deposition of Charles Saler ["Saler Dep."]) 1486.) All of this evidence is consistent with the fact that Patterson was a hostage. Plaintiff has pointed to no competent evidence that would suggest that Patterson agreed to accompany Ryan into the back room, or that she remained there of her own volition. Further, plaintiff has also failed to identify any evidence that would suggest that the officers believed that Patterson was Ryan's guest in the utility room. In addition to the threats by Ryan and the observed actions of Patterson crying, it is undisputed that the Sergeant Muntean immediately reported that there was a "hostage situation" developing at the salon. (Greenfield Dep. at 2063; McConnell Dep. at 1952.) Indeed, all of the information available to the officers at the scene would have led any reasonable officer to conclude that Ryan had taken a hostage.

of the shift that day, and he immediately left the station for the salon. (Greenfield Dep. at 2053.) Defendant McConnell, a detective with the Massillon Police Department, along with various other Massillon police officers, also responded to the call for assistance. (McConnell Dep. at 1952-53.)

When he arrived on the scene, McConnell was advised by Muntean that a suspect named Shane Ryan had barricaded himself in a small utility room at the rear of the salon with a hostage, later identified as Heather Patterson. (McConnell Dep. at 1953.) Ryan could be heard in the utility room yelling, and he appeared to be very upset. (*Id*.) Through the door that separated the utility room from the rest of the salon, Ryan demanded to speak with McLendon, and was heard to say "I'm going to die today. You [the police] will have to kill me. I'm going to force you guys to kill me." (Greenfield Dep. at 2064; *see* McConnell Dep. at 1954.) Patterson could also be heard through the door "whimpering[.]" (Greenfield Dep. at 2138.) Officers could tell that Patterson was also very upset. (McConnell Dep. at 1956.)

Within moments of his own arrival on the scene, Greenfield determined that the police were facing a "very serious situation[.]" (Greenfield Dep. at 2074.) Because Massillon did not have its own special weapons and tactics team ("SWAT"), Greenfield called dispatch to inquire as to the availability of other local SWAT teams. (*Id*.) He was advised that members of Canton's Regional SWAT could arrive within 40 minutes. (*Id*. at 2075.)

Defendant Saler, a Sergeant with Canton's Police Department and the leader of the Canton Regional SWAT, was contacted and apprised of the situation. (Doc. No. 62 (Deposition of Charles Saler ["Saler Dep."]) at 1462-63.) Pursuant to established protocol, Saler contacted defendant Lawver, Chief of the Canton Police Department, for the purpose of establishing that permission had been granted for the Canton Regional SWAT to assist the Massillon police force

4

in dealing with the stand-off. (*Id.* at 1464.) He was advised that the appropriate officials from Massillon and Canton had communicated and determined that the Canton Regional SWAT would offer its services. (*Id.* at 1465-66.) Saler then used a telephone notification system to summon other SWAT members to report for an emergency hostage mission. (Doc. No. 48-7 (Affidavit of Charles Saler ["Saler Aff.]) ¶ 2.) Defendants Shackle and Pellegrino, both Canton police officers and members of Canton Regional SWAT, reported to the Canton Police Station. Defendant Miller reported directly to the scene. (*Id.*)

While Greenfield, McConnell, and other Massillon police officers waited for Canton Regional SWAT members to arrive, McConnell initiated a conversation with Ryan through the closed door in an attempt to build a rapport with Ryan and calm him down. (McConnell Dep. at 1955-56.)  During this conversation, Ryan indicated that he needed a cigarette. (*Id.* at 1958.) On the counter of the salon, McConnell found a plastic shopping bag with loose tobacco, materials for rolling cigarettes, and a lighter. (*Id.* at 1958-60; Greenfield Dep. at 2065.) Ryan agreed to exchange the materials in the bag for several weapons, including scissors and a folding pocket knife. (McConnell Dep. at 1957.) The exchange was made when Ryan cracked the door open. (*Id.* at 1960-61.)

Approximately 15 minutes after the exchange, McConnell placed a call to Ryan and asked to speak with Patterson. (McConnell Dep. at 1962-63.) Once she was on the line, McConnell asked Patterson if she was all right and inquired as to whether Ryan had any other weapons in the utility room. At first, Patterson said she was not sure, but she later stated that she did not see any other weapons. (*Id.* at 1964.)

When Canton Regional SWAT arrived on the scene, Greenfield met the team's members in the salon's parking lot and began to brief them on the situation. (Greenfield Dep. at 2080;

Saler Dep. at 1475, 1484.) Saler and the other SWAT members were advised that Massillon police had been negotiating with Ryan for approximately one and one half hours, that he had a hostage, and that he had informed the officers that he would either kill a police officer or be killed by one. (Saler Aff. ¶ 3.) They were also informed that Massillon officers did not know if Ryan had any other weapons. (*Id.*)

Following the briefing, Greenfield escorted the SWAT members to the salon where they could hear Ryan yelling and screaming from the back room. It was clear to Greenfield that the situation had "turned really nasty really fast." (Greenfield Dep. at 2080; *see also id.* at 2138 ["the level of everything had changed"]; Saler Dep. at 1486 [the situation had changed "drastically"].) Greenfield and the SWAT members were informed that a call had been arranged between Ryan and McLendon that had ended with Ryan yelling, "You caused this", and when McConnell rejected Ryan's suggestion that McLendon be traded for Patterson, the communications broke down entirely and Ryan terminated the call. (Greenfield Dep. at 2079.)

Ryan's next comment through the door put everyone on high alert. Yelling, Ryan threatened the officers, stating "You've got [so many] minutes[5], and then I'm going to blow the place up." (McConnell Dep. at 1994.) Ryan informed the officers that he had opened up the natural gas lines, and he was going to kill the hostage and use his lighter to cause an explosion in the building. (Saler Dep. at 1486.) As Ryan was conveying this threat, Patterson, who had been whimpering, was "crying really loud." (Greenfield Dep. at 2138.) With these new threats from Ryan, the officers assembled agreed that the situation had significantly escalated to the point where it was necessary to breach the utility room. (Saler Dep. at 1490; McConnell Dep. at 1964-

---

[5] McConnell could not remember the exact time frame Ryan suggested, but it was a matter of minutes. (McConnell Dep. at 1994.)

6

65; Doc. No. 72 (Deposition of Paul Covert ["Covert Dep."]) at 2259-60.)

Saler formulated the hostage rescue plan. Because of the new risk of a gas explosion, he had to rule out the use of distraction devices, such as the beanbag shotgun and or a taser. (Saler Dep. at 1504.) As he and his team were preparing to enter the utility room, Saler heard Ryan, again, screaming that he was going to blow up the building and kill the hostage. (*Id*. at 1502.) Saler gave the order to storm the room. (Doc. No 66 (Deposition of Donald Miller ["Miller Dep."]) at 1862; *see* Saler Dep. at 1494.) Saler was first through the door, and, as he entered, he announced "Police, down now, let her go." (Saler Dep. at 1512; *see id*. at 1506.) Instead of heeding Saler's command, Ryan tried to ignite the lighter he had in his hand, which sparked but did not light. (*Id*. at 1505.) Ryan also moved behind Patterson, putting his arm around her neck. (*Id*. at 1507.)

Saler testified in his deposition that he attempted to use his ballistic shield to separate Patterson from Ryan. (*Id*. at 1512.) When that did not work, Saler shot Ryan once around his lower left rib cage. (*Id*. at 1515-16.) Ryan continued to hold onto Patterson and the lighter, and Saler shot Ryan again; this time the bullet hit the left side of Ryan's head. (*Id*. at 1516-17.) The entire exchange took only a few seconds. (*Id*. at 1522, 1539, 1549.) After Ryan fell to the ground, officers attempted to administer first aid, but Ryan ultimately died from his injuries.

Shortly after the stand-off, an internal investigation was conducted by the Stark County Sheriff's Office during which individuals who were at the scene, including Patterson and various Canton and Massillon police officers, were interviewed. No charges were ever filed in connection with the death of Ryan, and there is no record of any disciplinary action taken against any of the participants.

On July 27, 2015, plaintiff, as the administratrix of Ryan's estate, brought suit in this

Court against defendants. The complaint raises federal claims for violations of the Fourth and Fourteenth Amendments and the Due Process Clause, failure to train and supervise, excessive force, conspiracy, municipal liability, and failure to accommodate under Title II of the Americans with Disabilities Act ("ADA"). Plaintiff also raises state law claims for wrongful death, state law conspiracy, negligence and gross recklessness, gross negligence and deliberate indifference, intentional and negligent infliction of emotional distress, and survivorship. All individual defendants were sued in their individual and official capacities. (Doc. No. 1 (Complaint ["Compl."]).)

On October 2, 2015, the Court conducted a case management conference. At the request of the parties, the Court agreed to bifurcate discovery in this matter, allowing for an initial period of discovery and motion practice limited to the question of whether the individual defendants were entitled to qualified immunity. (Minutes Oct. 2, 2015.) After the completion of this initial discovery period, each party joined in one of three summary judgment motions.

## II. STANDARD OF REVIEW

### A.    Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light

8

most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing

the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

The summary judgment standard does not change when a court is presented with cross-motions for summary judgment. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 312 (6th Cir. 2010) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). "The fact that both parties have moved for summary judgment does not mean a court must grant judgment as a matter of law for one side or the other; rather, a 'court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* (quoting *Taft*, 929 F.2d at 248); *see 60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (the threshold requirement for all parties who seek summary judgment under Rule 56 demands that the moving party come forward with competent evidence showing that there is no genuine issue of material fact and that the movant is entitled to judgment in her favor as a matter of law) (citation omitted).

### B.  Defendants' Motions to Strike

Plaintiff's opposition to defendants' summary judgment motions relies heavily upon the unsworn interviews of various individuals who were at the scene, and were later interviewed as part of the post-shooting investigation conducted by the Stark County Sheriff's Office. In particular, plaintiff places significant weight on the interview of Massillon Police Officer Kervin

10

Brown, who was neither sued as a defendant, nor deposed during discovery. Both the Canton and the Massillon defendants move to strike the uncertified transcript of Officer Brown's interview, as well as the transcripts of other interviews conducted by Stark County. (Doc. No. 54 (Massillon Defendants' Motion to Strike ["Massillon Mot. Strike"]); Doc. No. 56 (Canton Defendants' Motion to Strike ["Canton Mot. Strike"]).) It is the position of both sets of defendants that the unsworn testimony of Brown and others is not acceptable evidence under Rule 56.

A party seeking or opposing summary judgment may rely on deposition transcripts, electronically stored documents, affidavits, declarations, and other materials. Fed. R. Civ. P. 56(c)(1)(A). Defendants argue that, because the interview of Officer Brown is not an affidavit, a sworn declaration, a deposition, or a signed interrogatory answer under oath, it represents incompetent hearsay testimony that cannot be relied upon to defeat summary judgment. "It is well established that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (unsworn witness statements taken during police investigation were properly excluded from consideration on summary judgment) (citations omitted); *see Dole v. Elliott Travel & Tours, Inc*., 942 F. 2d 962, 968 (6th Cir. 1991) ("Affidavits composed of hearsay and opinion evidence do not satisfy [Rule 56] and must be disregarded.") (quotation marks and citation omitted); *Purdy v. Newland*, No. 93-2110, 1994 WL 601341, at *1 n.1 (6th Cir. Nov. 2, 1994) (transcript of private investigator's unsworn interviews could not be considered on summary judgment) (citations omitted); *see also Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir. 2010) (citation omitted).

Plaintiff suggests that the unsworn statement of Brown and others interviewed as a part of the internal police investigation may properly be considered because they were produced during discovery. She cites generally to case law that provides that evidence produced pursuant to Rule

26 can be relied upon to support or oppose summary judgment. The fact that the unsworn transcripts were produced during discovery does not cure the fact that they contain inadmissible hearsay. In *Pollino v. City of Phila.*, No. Civ. A. 03-6288, 2005 WL 372105 (E.D. Pa. Feb. 15, 2005), a civil rights plaintiff attempted to offer the unsworn statements of three witnesses who were interviewed as part of a police investigation into a shooting death to oppose summary judgment. The witnesses were never deposed in discovery, but the statements were produced during discovery as part of the police's internal files regarding the shooting. The court ruled that the unsworn statements could not be construed as "competent evidence" and could not be relied upon when reviewing summary judgment. *Id*. at *7 (citation omitted).

Further, the court held that the fact that the statements were produced in discovery as a response to an interrogatory inquiring as to the identity of potential trial witnesses did not mean that the statements were incorporated into the evidence of the case. *Id.* ("The unsworn statements alleged to be incorporated by reference in the interrogatory answer are clearly nothing more than hearsay that would not be admitted at trial for substantive purposes" and "is not considered when reviewing summary judgment.") (citing *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 159 & 159 n.19, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). While acknowledging that answers to interrogatories can be used as "competent evidence" to defeat summary judgment, the mere mention of a police report containing these unsworn witness statements did not elevate them to the status of an affidavit based on personal knowledge under Rule 56(e). To permit such an expansive interpretation of the word "affidavit", the court concluded, "would have an unsworn statement be treated as the equivalent of an affidavit without the speaker swearing to the accuracy of the statement or testifying under oath that he or she is competent to give such testimony." *Id*. at *7. The Court finds the reasoning in *Pollino* persuasive. Like the case in

12

*Pollino*, the unsworn interview transcripts alleged to have been incorporated by reference in the interrogatory answer are "clearly nothing more than hearsay that would not be admitted at trial for substantive purposes." *Id.*

Plaintiff offers the affidavit of Brian Arnold, a Major with the Stark County Sheriff's Office, in which Arnold avers that he is the custodian of the records associated with the investigation into the shooting death of Ryan, and that the transcripts of the unsworn interviews of Brown and others are true and accurate copies of the investigation records. (Doc. No. 59 (Affidavit and Certificate of Authentication of Brian Arnold) at 1284.) She suggests that this affidavit demonstrates that the transcripts are public records that are admissible under Fed. R. Evid. 803(8) as an exception to the hearsay rule. To be sure, Arnold's affidavit solves the problem originally identified by defendants that the transcript was unauthenticated. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (unauthenticated documents do not meet the requirements of Fed. R. Civ. P. 56 and are inadmissible) (citations omitted). Arnold's affidavit establishes that the interviews of Brown and the other witnesses at the scene of the shooting took place as part of the Stark County Sheriff's investigation, and that the transcripts were produced as recordings of those interviews. This is not sufficient, however, to bring the statements contained in the transcripts within Rule 803(8)(A)(iii)[6] because the transcripts contain no fact findings. Rather, they are "simply a compilation of witness statements, all of which are hearsay." *Tranter*, 460 F. App'x at 515 (witness statements contained in a police report were not public records under former Rule 803(8)(C)) (citing, among authority, *United States v. Mackey*,

---

[6] Rule 803(8)(A)(iii) and (B) excepts "A record or statement of a public office if: it sets out: in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."

117 F.3d 24, 28 (1st Cir. 1997) ("In line with the advisory committee note to Rule 803(8), decisions in this and other circuits squarely hold that hearsay statements by third persons . . . are not admissible under this exception merely because they appear within public records)).

Because the unsworn statements contained in the interview transcripts prepared as part of the internal investigation into the shooting were hearsay, and no exception to the hearsay rule would have permitted their admission,[7] the Court rules that it may not consider them in ruling on summary judgment. Defendants' motions, and supplemental motions, to strike are granted.

## III. DISCUSSION

### A.    Qualified Immunity and Defendants' Dispositive Motions

The Massillon and Canton defendants assert that qualified immunity protects the police officers and municipal officials from liability for all federal claims asserted against them in their individual capacities. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quotation marks and citation omitted). "Qualified immunity provides police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, --U.S.--, 134 S. Ct. 3, 5, 187 L. Ed. 2d 341 (2013)). Qualified immunity will apply "'if officers of reasonable competence could disagree on the issue.'" *Id*. (quoting *Malley v.*

---

[7] Likewise, the Court rejects plaintiff's unsupported argument that the unsworn statements qualify under Rule 801(d)(2)(D) as an admission by an agent of a party. *Compare Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 722 (6th Cir. 2006) (statement of deputy police chief on subject of police promotions constituted an admission by a party) with *Perry v. City of Pontiac*, 254 F.R.D. 309, 316 (E.D. Mich. 2008) (rank-and-file police officers' statements would not constitute admissions by the city under Rule 801(d)(2)).

14

*Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first.[8] *See Pearson*, 555 U.S. at 236.

It is axiomatic that a citizen has a constitutional right, secured by the Fourth Amendment, not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Excessive force cases are analyzed under an "objective reasonableness" standard. *Id.* at 388. Whether or not a use of force is reasonable requires balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the

---

[8] On some occasions, it may be necessary to employ a third step, which is whether the plaintiff "'offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 468 (6th Cir. 2006) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004)).

governmental interests alleged to justify the intrusion." *Tenn. v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (quotation marks and citation omitted). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9). "This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Withers v. City of Cleveland*, 640 F. App'x 416, 419 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citation omitted).

An officer's use of deadly force is reasonable only if "'the officer has probable cause to believe that the suspect poses a threat of death or serious physical harm either to the officer or others." *Garner*, 471 U.S. at 11; *see Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious threat either to the police or members of the public.") (citations omitted). Ultimately, the plaintiff bears the burden of demonstrating that any force used was unjustified in order to establish a constitutional deprivation. *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989) (citations omitted).

### Standing

As an initial matter, plaintiff advances the rather novel argument that the individual defendants lack standing to assert qualified immunity because the Massillon defendants "abdicated" their authority when they enlisted the services of the Canton Regional SWAT and

16

permitted this group to take control of the stand-off. (Massillon MSJ Opp'n at 1259.) In support, plaintiff cites Article XVII, Section III, of the Ohio Constitution. Known as the "Home Rule" Amendment, this section provides that "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Ohio Const. art. XVIII, § III. It is plaintiff's position that the Canton defendants usurped the constitutional authority given to Massillon to govern within its municipal boundaries when the Canton Regional SWAT took charge of the situation at the salon. Plaintiff believes that "[t]his usurpation of constitutional authority cannot be a legitimate police function[,]" and, therefore, the individual defendants from both municipalities were not performing legitimate, discretionary functions when deadly force was used against Ryan. (Canton MSJ Opp'n at 1434.)

Plaintiff's creative (albeit wholly frivolous) argument represents a fundamental misunderstanding of the Home Rule Amendment. The purpose of the amendment was to "distinguish between state and municipal lawmaking authority." *Am. Fin. Servs. Ass'n v. Cleveland*, 858 N.E.2d 776, 781 (Ohio 2006). It "gives municipalities the 'broadest possible powers of self-government in connection with all matters which are strictly local and do not imping upon matters which are of a state-wide nature or interest.'" *Mothers Against Drilling in Our Neighborhood v. State*, 60 N.E.3d 727, 731(Ohio Ct. App. 2016) (quoting *State ex rel. Hackley v. Edmonds*, 80 N.E.2d 769, 773 (Ohio 1948)). The only restriction on a municipality's authority to act within its boundaries, under the amendment, is the prohibition against passing laws that conflict with the Ohio Constitution or its laws. *See* Ohio Const. art. XVIII, § III.

The amendment does not prohibit, as plaintiff suggests, local municipalities from enlisting the aid of other municipalities or law enforcement entities, nor do the statutory laws of

17

the State of Ohio forbid it.[9] In fact, the Ohio Revised Code specifically sanctions it. Section 737.04 of the Ohio Revised Code provides that a municipality may "enter into contracts with one or more municipal corporations, township police districts, [or] joint police districts . . . for services of police departments or the use of police equipment or for the interchange of services of police departments . . . within the several territories of the contracting subdivision." Ohio Rev. Code § 737.04.[10] Further, section 737.041 permits a police department of any municipality to provide police protection, upon approval, to any other municipality. Ohio Rev. Code § 737.041. *See State ex rel. Ohio Civil Serv. Employees Ass'n v. City of Coshocton*, 448 N.E.2d 834, 835 (Ohio Ct. App. 1982).

Thus, the Massillon defendants were clearly exercising legitimate job-related police functions when they responded to a hostage situation within its boundaries, and then called for the assistance of the Canton Regional SWAT. Likewise, the Canton defendants did not usurp Massillon's authority when it agreed to assist. Because all members of law enforcement were engaged in job related police functions when they responded to the stand-off at the salon and

---

[9] Even plaintiff's authority—a decision issued by the Supreme Court of Washington—does not support her position that the individual defendants lack standing to assert qualified immunity. In *Brown v. City of Cle Elum*, 261 P. 112, 113 (Washington 1927), the court, applying a similar "home rule" amendment, held that a municipality exceeded its authority when it passed an ordinance punishing certain proscribed acts committed on property six miles beyond the corporate limits of the municipality. Thus, the decision is clearly distinguishable from the situation before this Court where a municipality lawfully requested assistance within its own boundaries. Moreover, later Washington state court cases made clear that Washington's version of the "home rule" amendment did "not prohibit [a] municipality or county from entering into a legislatively authorized contract with another municipality or county, which is in whole or part outside its borders, to preform functions for the latter that the latter had authority to provide within its borders." *See Lakehaven Util. Dist. v. Pierce Cnty.*, No. 60007-9-I, 145 Wash. App. 1019, at *3 (Wash Ct. App. June 23, 2008).

[10] In fact, pursuant to this statutory section, Ohio courts have held that a municipal corporation is not even required to maintain its own police department and may contract for all of its police protection to be provided by another municipality or law enforcement entity. *See State ex rel. Ohio Civil Service Employees Ass'n v. City of Coshocton*, 448 N.E.2d 834, 835 (Ohio Ct. App. 1982).

encountered Ryan, they were acting within their discretionary authority and may assert qualified immunity.[11]

*Individual Inquiry*

The Court now turns to the merits of defendants' dispositive motions. Because of the factually particularized nature of the qualified immunity analysis, "'[e]ach defendant's liability must be assessed individually based on his own actions.'" *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). "'To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Id*. (quoting *Binay*, 601 F.3d at 650).

*Officer Saler*

Because Saler led the team that breached the utility room and was most directly involved in the use of force against Ryan, the Court begins its individualized inquiry with him. The first question the Court must answer as to this defendant is whether, under the totality of circumstances, it was objectively reasonable for Saler to use deadly force against Ryan. The Court finds it was. The undisputed competent evidence demonstrates that the police responded to a hostage situation, wherein the suspect had, at various times, been armed with a knife and

---

[11] Plaintiff has also suggested that defendants lack standing because it cannot be a legitimate police function to "provide an accelerant and ignition device to a suicidal man and then immediately kill him for possessing them[.]" (Canton MSJ Opp'n at 1435.) This misrepresents the nature of the Court's inquiry. "[T]o pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description." *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004) (In determining "whether a police officer may assert qualified immunity against a Fourth Amendment claim, [the Court does] not ask whether he has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures in *general* is a part of his job-related powers and responsibilities.") (emphasis in original) (citation omitted).

scissors and had threatened to kill the hostage. He also had informed officers that he had opened a gas line and was planning to cause an explosion with a lighter. Moreover, when the officers breached the utility room, Ryan attempted to ignite the lighter and refused to release the hostage. Even after the first shot was fired, Ryan refused to release the hostage or the lighter.

According to these undisputed facts, each of the *Graham* factors weighs heavily in favor of applying qualified immunity as Saler, and the officers, faced a serious hostage situation, involving a suspect who—rather than give up—had informed the officers that they would have to kill him. Further, while the hostage did not see any other "weapons" in the utility room, various officers testified that they could not rule out the presence of other sharp instruments that could be used as weapons, and, in any event, they knew that Ryan was threatening to use the lighter as a weapon.

Judging Saler's conduct from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight, the Court finds that Saler's actions were objectively reasonable under the circumstances. Ryan's actions would have led any reasonable officer to believe that he posed an immediate and significant threat to the safety of the hostage and the officers in the building. *See Pollard*, 780 F.3d at 403 (qualified immunity available where officers mistakenly believed defendant had a gun, the defendant had made gestures toward the police suggesting he had a weapon, and he demonstrated that he was willing to do almost anything, including endangering his own life, to avoid arrest); *Bell v. Irwin*, 321 F.3d 637, 639-40 (7th Cir. 2003) (affirming qualified immunity for officers' use of force where suspect threatened to blow up his house using propane gas and had indicated to police that he would only come out "feet first"); *see, e.g., Wells v. City of Chattanooga, Tenn.*, No. 1:09-CV-219, 2011 WL 2749563, at *4-6 (E.D. Tenn. July 14, 2011) (qualified immunity protected officers where

officers used deadly force to neutralize a suspect who had advised officers that they would have to kill him and it was reasonably believed that he may have taken hostages).

It is worth underscoring the undisputed fact that the officers did not make the decision to even attempt a rescue of the hostage until "*after* a dramatic change in circumstance"; namely, Ryan threatening to kill the hostage and blow up the building. *See Pollard*, 780 F.3d at 403 (referring to the suspect making gestures indicating that he had a weapon) (emphasis in original). Further, the undisputed record demonstrates that only a few seconds expired between the time the officers entered the utility room and Saler shot Ryan twice. "While the evaluation of reasonableness must . . . recognize that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation . . . , the fact that a situation unfolds relatively quickly does not, by itself, permit officers to use deadly force." *Withers*, 640 F. App'x at 419 (quotation marks and internal citations omitted). Still, the fact that a dangerous situation was "tense, uncertain and rapidly evolving" weighs in favor of finding qualified immunity. *See Rush v. City of Lansing*, 644 F. App'x 415, 421 (6th Cir. 2016) ("Immediately before [the officer] fired the first shot, [the suspect] drew a knife and slashed at [the officer] from an arm's length away. Under those circumstances, it was not unreasonable for [the officer] to use deadly force by shooting at" him.) (quotation marks and citation omitted); *Mullins*, 805 F.3d at 767 (the officer "was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself and the public was reasonable"); *see also Pollard*, 780 F.3d at 403 ("It is [the facts related to the suspect's threatening gestures] immediately preceding the shooting which weigh most heavily in assessing the officers' split-second decision to shoot.") (citation omitted).

In opposing summary judgment on qualified immunity, plaintiff relies on the unsworn statements of Brown and another officer, Jolina Boyer, who were interviewed during the investigation that followed the shooting to support her position that the hostage was safely out of the utility room before Officer Saler opened fire on Ryan. (*See, e.g.*, Massillon MSJ Opp'n at 1254-55.) It is plaintiff's belief that this evidence establishes a fact dispute as to whether there was still a risk of death or serious injury to the hostage when Saler used deadly force. The Court disagrees, as it has already ruled that plaintiff may not rely on this incompetent evidence to generate a genuine issue of material fact in the face of a properly supported summary judgment motion.

However, even if these unsworn interview transcripts were properly before the Court, they would not serve to create a fact dispute sufficient to defeat summary judgment. Neither officer was in the utility room when Saler and his team breached it, as both Massillon officers had been asked to retreat to allow Canton SWAT access to the room. Additionally, neither officer stated that the hostage was safely out of the building when the shots were fired. Officer Boyer indicated that, "As they [Canton SWAT members] made entry I heard two shots fired and saw the victim hysterical and screaming face down near the doorway, body probably half in half out." (Doc. No. 59-5 (Interview of Patrolman Jolina Boyer ["Boyer Int."]) at 1335.) Similarly, Officer Brown ambiguously stated that he heard the shots as "we're taking [Patterson] out of the building." (Doc. No. 59-11 (Interview of Patrolman Kervin Brown ["Brown Int."]) at 1351.) Even by their accounts, the hostage was in the process of being removed from the room and the building at the time, and was still in jeopardy of being injured by an explosion.

Of course, even if the hostage had been safely escorted out of the building, the officers were still at risk of being injured in the explosion Ryan was threatening to cause. An officer may

factor in the risk of serious injury to himself and his fellow officers, in addition to the risk to members of the public, into the calculation of whether to employ deadly force against a suspect. *See Garner*, 471 U.S. at 11; *Williams*, 496 F.3d at 487. It is undisputed that Ryan had previously threatened to blow up the building, and that he was still holding the lighter when Canton SWAT entered the room. Given the fluid nature of the events that were rapidly unfolding, the Court cannot (and will not) second guess the decision to use deadly force. *See also Plumhoff v. Rickard*, --U.S.--, 134 S. Ct. 2012, 2022, 188 L. Ed. 2d 1056 (2014) ("if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended").

Plaintiff also criticizes defendants because they did not take steps to cut off the gas supply to the utility room, "even though it could have been turned off by hand at the back door." (Canton MSJ Opp'n at 1427.) In support, she offers pictures depicting the gas meters at the back of the salon. (Doc. Nos. 59-7, 59-8, 59-9, 59-10.) There is no evidence in the record, however, that, if believed, would establish that the gas being supplied to the utility room could have been shut off using the gas meters shown in the photograph, or that it could have been done within the brief time frame imposed by Ryan before he planned to blow up the building. Instead, defendant Miller testified that the procedure followed by the police would be to contact the gas provider and have the provider cut off the gas supply. (Miller Dep. at 1842-43.) Saler testified that this procedure can be "as quick as a half hour and as long as four hours." (Saler Dep. at 1541.) In other words, there is no evidence it could have been done quickly enough. More to the point, even if the failure to shut off the utilities represented a miscalculation on the part of defendants, the qualified immunity analysis clearly allows for good faith mistakes in judgment, and there is no evidence that any such miscalculation (if there was a miscalculation) was intentional. *See*

23

*Chappell*, 585 F.3d at 907 (citing *Pearson*, 555 U.S. at 231).

Ultimately, the Court finds that Ryan posed an immediate serious threat to the hostage and the officers inside the building at the time Saler shot him.[12] Consequently, the use of lethal force was reasonable and Saler is entitled to summary judgment on the issue of qualified immunity. Further, because a reasonable fact-finder, viewing the facts in the light most favorable to plaintiff, could not find that Saler violated Ryan's constitutional rights through excessive use of force, it is unnecessary to consider whether any allegedly violated right was clearly established at the time of the incident.

### Other Individual Defendants

All other individual defendants from both Canton and Massillon are entitled to summary judgment on the issue of qualified immunity because plaintiff has failed to identify genuine issues of material fact as to whether Ryan's constitutional right to be free from excessive force was violated. Even if Ryan's constitutional rights had been violated, and those same rights were clearly established at the time of the shooting, Miller, Pellegrino, and Shackle would be entitled to qualified immunity because there is no evidence that they could have intervened to prevent the use of force by Saler. Though they were in the utility room at the time of the shooting, it is undisputed that the entire incident occurred in a matter of seconds. *See Ontha v. Rutherford Cnty., Tenn*., 222 F. App'x 498, 506 (6th Cir. 2007) ("courts have been unwilling to impose a

---

[12] Plaintiff also relies on photographs of Ryan's body that were contained in the coroner's report, and suggests these photographs "contradict" Saler's account of the incident because they "show that Ryan's right arm had been at his side when Saler shot thorough the arm and into the chest." (Canton MSJ Opp'n at 1442, citing Doc. No. 59-20 and 59-21.) Plaintiff represents that "[t]his is significant because it shows that while Saler admitted he knew what was in Ryan's right hand he must have also known that nothing could be used in the left." (Canton MSJ Opp'n at 1442.) As Canton defendants have correctly observed, however, the photographs actually show Ryan's *left* arm, which was near his side and being used to hold the hostage close to him, which is consistent with Saler's testimony. (Saler Dep. at 1513.)

duty to intervene where, as here, an entire incident unfolds 'in a matter of seconds'") (collecting cases). The same holds true for Officer McConnell, who was not even in the utility room at the time of the shooting, and had even less of an opportunity to intervene.

Plaintiff has attempted to assert liability for the use of force by Saler against the remainder of the individual Massillon defendants by alleging that they permitted what she has referred to as the "abdication of authority" that led to the Canton Regional SWAT being placed in a position to use force against Ryan. Similarly, plaintiff's primary theory of liability against the remaining individual Canton defendants is their alleged usurpation of Massillon's authority to exercise its police powers within its geographic district. As this Court has already determined, however, the Massillon defendants properly permitted the Canton Regional SWAT to participate in, and take control of, the stand-off. Thus, the remaining defendants are entitled to qualified immunity as against any allegations that polices they implemented, or supervision they provided, led to the cooperative effort by Massillon and Canton to address the hostage situation that led to Ryan's death.

### B.    Remaining Claims in the Complaint and Plaintiff's Motion to Strike

Defendants also seek dismissal of the remaining claims in the complaint, including plaintiff's ADA and state law claims. Noting that the Court bifurcated this case and limited the initial period of discovery to the issue of excessive force and the availability of qualified immunity, plaintiff argues that defendants' summary judgment motions seek rulings that are outside the qualified immunity boundaries set by the Court's case management plan. Plaintiff moves to strike defendants' summary judgment arguments that the remaining claims should be dismissed, or, in the alternative, to hold in abeyance these arguments until after the qualified immunity issue has been resolved. (Doc. No. 50 ["Plaintiff Mot. to Strike"].)

In support of her motion to strike, plaintiff suggests defendants' summary judgment motions "stray into areas in which discovery has not yet been permitted by this Court." (*Id.* at 1201.) Plaintiff has a point, and, to the extent that defendants' dispositive motions sought rulings on subject matters for which no discovery has taken place, the Court would agree that any ruling, without the opportunity for discovery, would be premature. However, as will be seen below, the discovery that has been conducted regarding the July 28, 2013 shooting incident, as well as the Court's ruling on the availability of qualified immunity, foreclose the possibility the remainder of the claims can be maintained.[13] Accordingly, plaintiff's motion to strike is denied.

*Monell Liability and Failure to Train*

Plaintiff seeks to hold Massillon and Canton liable under a theory that the policy and customs implemented by these municipalities resulted in a deprivation of Ryan's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). However, "the constitutional violation of a municipal official is a prerequisite to municipal liability." *Pollard*, 780 F.3d at 404 (citing *Weeks v. Portage Cnty. Exec. Offices*, 235 F.3d 275, 279 (6th Cir. 2000)). Because the Court has determined that Ryan's constitutional rights were not violated by the use of force employed against him, defendants are entitled to summary judgment on plaintiff's claim of municipal liability. *See, e.g., Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014); *Pollard*, 780 F.3d at 404; *see also Los Angeles v. Heller*, 475 U.S.

---

[13] Additionally, the Court notes that plaintiff fully briefed defendants' arguments that they were entitled to summary judgment on the remaining claims in the complaint. In doing so, plaintiff failed to identify any additional discovery that was required to fully respond to defendants' motions.

796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) ("Neither *Monell . . .* nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.").

*Conspiracy under Federal Law (42 U.S.C. § 1983)*

The Court's ruling on qualified immunity also dooms plaintiff's federal conspiracy claim. "A civil conspiracy [under Federal law] is an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quotation marks and citation omitted). To prevail on a civil conspiracy claim under 42 U.S.C. § 1983, a plaintiff must show: (1) a single plan existed; (2) the defendants shared in the general conspiratorial objective to deprive plaintiff of his constitutional or federal statutory rights; and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *Id.* at 602 (citation omitted).

The complaint alleges that the defendants conspired to injure Ryan [by shooting and killing him] by unlawful means. (Compl. ¶ 279.) Beyond this conclusory allegation, however, plaintiff has failed to allege any facts in support of her federal conspiracy claim, rendering the claim fatally deficient. *See Robertson*, 753 F.3d at 622 (a plaintiff must plead the existence of a conspiracy with some degree of specificity); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (same). In addition to the pleading deficiency, however, the claim fails because the Court has determined that Ryan's constitutional right to be free from excessive force was not violated. Because plaintiff's conspiracy claim was premised on defendants' use of force, the conspiracy

27

claim ails, as well.[14] *See Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 463 (6th Cir. 2011) (citing, among authority, *Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009) (where plaintiff failed to show an underlying constitutional violation that injured her, plaintiff cannot prevail on her conspiracy claim).

### Substantive Due Process

Plaintiff's substantive due process claim is based on allegations that Ryan's death was the result of a state created danger. Plaintiff argues that Saler and the other Canton Regional SWAT members manufactured the danger from a possible explosion by supplying a mentally unstable and suicidal man with a lighter. (Canton MSJ Opp'n at 1436 [While defendants "supplied the room with an unending stream of natural gas, [d]efendants handed Ryan a cigarette lighter."].) To establish a state created danger claim, a plaintiff must show: (1) an affirmative act by the state that created or increased the risk to the plaintiff; (2) a special danger to the victim as distinguished from the public at large; and (3) the requisite degree of state culpability. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 464 (6th Cir. 2006) (citation omitted). Under this theory of liability, the officers' acts must be made with "deliberate indifference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Sixth Circuit has "equated [deliberate indifference] with subjective recklessness." *Cutlip v. City of Toledo*, 488 F. App'x 107, 117 (6th Cir. 2012) ("[The] plaintiff [must] show that the state 'official knows of and

---

[14] Plaintiff's state law conspiracy claim is pled with even less specificity than the one brought under § 1983. Indeed, the Thirteenth Claim for Relief provides simply that "Said acts (referring to all factual allegations in the complaint) constituted the tort of civil conspiracy under Ohio law." (Compl. ¶ 277.) Under Ohio law, a claim for civil conspiracy requires "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (quoting *Le-Fort v. Century 21-Maitland Realty Co*. 512 N.E.2d 640, 645 (Ohio 1987)). The only facts plaintiff alleges that would support the existence of a conspiracy involve the decision by officials from Massillon and Canton to use Canton Regional SWAT, a decision that the Court has already determined was lawful. Additionally, without an underlying tort, this derivative claim must fail. *See Burgess v. Fischer*, 735 F.3d 462, 483 (6th Cir. 2013) (quotation marks and citation omitted).

disregards an excessive risk to [the victim's] health or safety . . . in a manner demonstrating 'reckless or callous indifference' toward the individual's rights.") (quoting *Ewolski*, 287 F.3d at 513) (further quotation marks and citation omitted). And where the police are choosing from a number of risky options, "'a plaintiff must show that the police 'knowingly and unreasonably' opted for a course of conduct that entailed a substantially greater total risk than the available alternatives.'" *Id.* (quoting *Ewolski*, 287 F.3d at 515). The Court's ruling on qualified immunity is fatal to plaintiff's substantive due process claim.

Although the officers traded Ryan's deadly weapons for cigarettes and a lighter, there is no evidence that the officers acted with deliberate indifference to a risk of injury to Ryan, or that they could have foreseen that the exchange would lead to an escalation of the situation. Rather, they reasonably convinced Ryan to exchange known dangerous weapons in his possession for cigarette rolling material and a lighter. It was Ryan who created the dangerous situation by turning a fairly innocuous cigarette lighter into a mechanism to trigger a dangerous explosion. *See, e.g., Camp v. Knox Cnty, Tenn.*, No. 3:14-CV-257-PLR-HBG, 2015 WL 461642, at *4 (E.D. Tenn. Feb. 3, 2015) (rejecting "state-created danger" theory of liability because the suspect created the danger by barricading himself in a bedroom with a weapon). Further, it is undisputed that Ryan did not threaten to use the cigarette lighter as a weapon until more than fifteen minutes after the trade when communications with his ex-girlfriend had broken down. There is no evidence that the officers could have anticipated this development, let alone deliberately opted for a course of conduct that was obviously going to result in a need to employ deadly force. Defendants are entitled to summary judgment on this claim.

### Title II of the ADA and Failure to Train

Plaintiff alleges that defendants violated the ADA by failing to reasonably accommodate

29

Ryan's disability by neglecting to transport him to a mental health facility. (*See* Compl. ¶ 265.) Plaintiff also alleges that Canton and its supervisory employees failed to properly train its employees regarding interaction with mentally disabled individuals. While the pleading is not entirely clear, plaintiff's ADA claim appears to rest on allegations that various individual defendants failed to take steps to deescalate the situation, and, instead, supplied Ryan with a cigarette lighter and failed to cut off the supply of gas to the utility room. (*Id.* ¶¶ 267-270.) As part of her claim, she alleges that Ryan was not a threat to police officers once he was barricaded in the utility room until officers supplied him with a lighter and natural gas. (*Id.* ¶ 267.) *See Jones v. Lacey*, 108 F. Supp. 3d 573, 588 n.1 (E.D. Mich. 2015) (citing *Everson v. Leis*, 412 F. App'x 771, 774 (6th Cir. 2011) ("'[W]hether Title II applies to arrests is an open question in [the Sixth] Circuit . . . .'")). The Court assumes for the purposes of this analysis, however, that Title II ADA claims arising in the context of a police stand-off and attempted arrest are viable in this circuit.

Plaintiff complains that any ruling on her ADA claim would be premature as the parties have not yet conducted any discovery relative to Ryan's alleged mental impairments. However, even if the Court assumes that Ryan was disabled for purposes of the ADA, its ruling that officers acted objectively reasonable in using deadly force in response to a dangerous and quickly evolving hostage situation precludes this claim.

"Under the ADA, 'No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.'" *Thompson v. Williamson Cnty., Tenn.*, 219 F.3d 555, 557 (6th Cir. 2000) (quoting 42 U.S.C. § 12132). In the Sixth Circuit,

> To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) []he has a disability; (2) []he is otherwise qualified; and (3) []he was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of [his] disability.

*Anderson v. City of Blue Ash*, 798 F.3d 338, 357 & n.1 (6th Cir. 2015) (citing *Tucker v. Tenn.*, 539 F.3d 526, 532 (6th Cir. 2008) and *Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005), but eliminating the requirement that discrimination be "solely" because of plaintiff's disability, finding that in Title II claims, discrimination must be shown to have been "because of" the individual's disability.) A prima facie case requires a plaintiff to show that the discrimination was *intentionally* directed toward him or her in particular." *Tucker*, 539 F.3d at 532 (emphasis in original).

In *Thompson*, a police officer responded to a 911 call from the decedent's brother, who indicated that the decedent was threatening family members with a machete. The responding officer was forced to shoot to kill when the decedent raised a machete as if to throw it at the officer. *Id*. at 556. The Sixth Circuit ruled that the ADA claim failed, as a matter of law, because the decedent was not denied access to a public service and, if he was, it was not because of disability. *Id.* at 557. The court reasoned that the officer's failure to disarm and transport the decedent to a hospital for treatment was not the result of inadequate training in dealing with mental disabled individuals, but was because the decedent "threatened him with a deadly weapon before he could subdue him. Thus, if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled." *Id*. at 558 (citation omitted). *See Wolfanger v. Laurel Cnty, Ky.*, 308 F. App'x 866, 867-68 (6th Cir. 2009) (county and officers were entitled to summary judgment on plaintiff's Title II ADA and failure to train claims because it was objectively reasonable for officers to use deadly force against

31

disabled man who pointed a gun at them); *Dillery*, 398 F.3d at 568 (plaintiff could not establish a prima facie case of discrimination where the record reflected that plaintiff was stopped by the police because her practice of operating her motorized wheelchair in the street was a safety hazard, not because of her disability); *see also Tucker*, 539 F.3d at 536 (concluding that when "officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns").

Similarly here, the Court's ruling that Saler acted in an objectively reasonable manner when he employed deadly force in response to Ryan's threatening behavior forecloses plaintiff's Title II ADA claim. The failure to disarm Ryan and transport him for treatment was not the result of inadequate training with dealing with mentally unstable individuals, but because Ryan threatened to kill his hostage and the officers before he could be subdued. Accordingly, he was not denied access to medical care because of any disability, but because of his own threatening and dangerous behavior. Moreover, in light of the volatile and rapidly evolving circumstances faced by the officers at the scene, it would have been unreasonable to require the officers to attempt to accommodate Ryan's disability before neutralizing the danger Ryan's conduct created. Plaintiff's Title II ADA claim, therefore, is subject to dismissal. *See Tucker*, 539 F.3d at 536; *Scozzari v. City of Clare*, 723 F. Supp. 2d 974, 981 (E.D. Mich. 2010) ("if [plaintiff's] behavior was highly alarming, it would seem unreasonable to require the Officers to take the time to contact a mental health professional") (citation omitted).

### State Claims and Tort Immunity

Section 2744 of the Ohio Revised Code extends to municipalities immunity from tort liability for governmental and propriety functions. Ohio Rev. Code § 2744.02(A)(1); *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). It is well settled that "government functions" include

the operations of law enforcement. *See* § 2744.01(C)(2)(a); *Harris v. Sutton*, 918 N.E.2d 181, 185 (Ohio Ct. App. 2009). There are, however, certain exceptions to the general grant of immunity spelled out in the statute. Specifically, immunity is not available to a municipality where: (1) injury or damage is caused by a municipal employee's negligent operation of a motor vehicle [§ 2744.02(B)(1)]; (2) the losses are due to the negligent performance of employees with respect to proprietary functions of a political subdivision [§ 2744.02(B)(2)]; (3) damages are the result of a municipality's negligent failure to keep public roads in repair [§ 2744.02(B)(3)]; (4) damages are the result of a physical defect on the grounds of public buildings used for government functions [§ 2744.02(B)(4)]; and (5) civil liability is expressly imposed by another provision of the Ohio Revised Code § 2744.02(B)(5).

Based on the undisputed record facts regarding the incident leading to the shooting death of Ryan, there can be no doubt that Canton and Massillon qualify for immunity under Ohio Rev. Code § 2744.02(A)(1), as its employees were engaged in the governmental function of police activities while at the hair salon on July 28, 2013. Further, there are no exceptions that would apply to the circumstances as they are known following the period of discovery on qualified immunity. Thus, to the extent that the municipalities are sued under state law, they are entitled to immunity for plaintiff's state tort claims. *See generally Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 744 (N.D. Ohio 2008) ("Ohio courts have held that political subdivisions are entitled to immunity under § 2744.02 for the intentional torts committed by their employees.") (collecting cases).

Ohio Rev. Code § 2744 also provides immunity for tort actions for employees of political subdivisions, provided their acts and omissions were not "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in

bad faith, or in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b). "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id*. "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owned in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted). "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*.

Based on the same analysis presented above with respect to federal qualified immunity, the Court concludes that there are no genuine issues of material fact and that the individual defendants are entitled to immunity from liability in connection with plaintiff's state law claims. In the same way in which she failed to demonstrate that Saler's actions were objectively unreasonable, plaintiff has also failed to show that Saler and the other individual defendants acted with "malicious purpose, in bad faith, or in a wanton or reckless manner." *Chappell*, 585 F.3d at 916 n.3 (holding that failure to prove objective unreasonableness to avoid qualified immunity under 42 U.S.C. § 1983 also defeated claim for qualified immunity under Ohio law); *see Pollard*, 780 F.3d at 404 ("If the officers were objectively reasonable in shooting Bynum, it logically follows that they could not have been reckless in shooting Bynum"); *Mullins*, 805 F.3d at 769 ("Because we find that [the officer's] use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid statutory immunity under Ohio

34

law.") (quoting Ohio Rev. Code § 2744.03(A)(6)(b)).

### C.    Plaintiff's Motion for Summary Judgment

Plaintiff also seeks summary judgment on the issue of the availability of qualified immunity. Her motion is built on a dubious foundation of incompetent evidence and mischaracterizations of the competent record before the Court. For example, plaintiff framed her request for summary judgment around representations that Ryan went to the salon "in hopes of seeing his girlfriend" and "made a disturbance when he learned [she] was not there." Plaintiff further claimed that the police arrived, "treat[ing] the event" as a hostage situation, causing Ryan to "fle[e] into" the back room "accompanied" by one of the employees. Saler then entered the room and, after seeing "no weapons in Ryan's hands," and after seeing the "employee . . . hurried . . . out of the room," shot him twice. (Plaintiff MSJ at 1023-24) (capitalization omitted). She concludes that because Saler "had never seen Ryan holding or touching a weapon" he "knew that Ryan could not reach out to harm anyone." (*Id*. at 1030-31) (capitalization omitted).

These characterizations constitute gross misrepresentations of the record before the Court, the most egregious of these being the representation that Ryan was unarmed and a danger to no one when he was shot by police. Instead, the undisputed record demonstrates that Ryan was holding a lighter and, instead of giving up, he attempted to ignite it when the members of the Canton Regional SWAT entered the room.[15] When coupled with the threats that Ryan had previously made (and conveniently omitted from plaintiff's summary judgment motion)—that

---

[15] Plaintiff simply cannot have it both ways. While she insists that Ryan was "unarmed," she also argues that defendant's erred by giving a "suicidal man" a "deadly weapon." (Canton MSJ Opp'n at 1437; *see also id*. ("Captain Covert agreed with McConnell that officers have no discretion to *arm* the suicidal.") The record clearly establishes that Ryan turned the cigarette lighter into a deadly weapon when he indicated that he was prepared to use it to cause harm to himself, the hostage, and the officers.

the officers would have to kill him and that he would kill the hostage and blow up the building—it is clear that the danger faced by the responding officers was very real. No amount of massaging the facts can escape this conclusion.

Plaintiff concedes, as she must, that the use of deadly force is reasonable, and constitutional, if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." (*Id*. at 1028 (quoting *Chappell*, 585 F.3d at 908).) Yet, the undisputed facts demonstrate that the risk to the hostage and the officers at the scene was significant, and the officers had only seconds to respond. Given the evolving nature of this dangerous situation, plaintiff cannot establish that no reasonable fact-finder, viewing the facts in the light most favorable to defendants, would find that defendants' actions were objectively unreasonable.

Plaintiff also relies extensively on the transcribed interview of Officer Brown, and, in particular, Brown's representation that the hostage was in the process of being rescued from the utility room when Saler shot Ryan. (*Id*. at 1025.) The Court has already set forth in detail why this unsworn statement may not be considered on summary judgment. The Court has also discussed, in depth, the limitations of this evidence, and how it fails to demonstrate that the risk of injury or death to the hostage and the officers from a gas explosion had dissipated.

Accordingly, plaintiff is not entitled to summary judgment.

## IV. Conclusion

The shooting death of Shane Ryan was a tragedy. Yet, not all tragic events are the result of constitutional violations. The undisputed record compels the Court to conclude that, tragic as it was, the death of Ryan was not the result of a violation of his constitutional rights. Such a finding entitles the individual defendants to qualified immunity, and prevents plaintiff from

continuing to prosecute the claims in her complaint.

Accordingly, and for all of the foregoing reasons, plaintiff's motion for summary judgment is denied, and defendants' summary judgment motions are granted. This case is dismissed.

**IT IS SO ORDERED**.

Dated: December 30, 2016

                              _____
                                **HONORABLE SARA LIOI**
                                **UNITED STATES DISTRICT JUDGE**